GARRETT, J.
*510 Melissa and Aaron Klein, the owners of a bakery doing business as Sweetcakes by Melissa (Sweetcakes), seek judicial review of a final order of the Bureau of Labor and Industries (BOLI) finding that the Kleins' refusal to provide a wedding cake to the complainants, a same-sex couple, violated ORS 659A.403, which prohibits a place of public accommodation from denying "full and equal" service to a person "on account of * * * sexual orientation." The order further concluded that the Kleins violated another of Oregon's public accommodations laws, ORS 659A.409, by communicating an intention to unlawfully discriminate in the future. BOLI's order awarded damages to the complainants for their emotional and mental suffering from the denial of service and enjoined the Kleins from further violating ORS 659A.403 and ORS 659A.409.
In their petition for judicial review, the Kleins argue that BOLI erroneously concluded that their refusal to supply a cake for a same-sex wedding was a denial of service "on account of" sexual orientation within the meaning of ORS 659A.403 ; alternatively, they argue that the application of that statute in this circumstance violates their constitutional *1057 rights to free expression and to the free exercise of their religious beliefs. The Kleins also argue that they were denied due process of law because BOLI's commissioner did not recuse himself in this case after making public comments about it, that the damages award is not supported by substantial evidence or substantial reason, and that BOLI erroneously treated the Kleins' public statements about this litigation as conveying an intention to violate public accommodation laws in the future.
As explained below, we reject the Kleins' construction of ORS 659A.403 and conclude that their denial of service was "on account of" the complainants' sexual orientation for purposes of that statute. As for their constitutional arguments, we conclude that the final order does not impermissibly burden the Kleins' right to free expression under the First Amendment to the United States Constitution. We conclude that, under *511 Employment Division, Oregon Department of Human Resources v. Smith , 494 U.S. 872, 110 S.Ct. 1595, 108 L. Ed. 2d 876 (1990), the final order does not impermissibly burden the Kleins' right to the free exercise of their religion because it simply requires their compliance with a neutral law of general applicability, and the Kleins have made no showing that the state targeted them for enforcement because of their religious beliefs. For substantially the same reasons for which we reject their federal constitutional arguments, we reject the Kleins' arguments under the Oregon Constitution. We also reject the Kleins' arguments regarding the alleged bias of BOLI's commissioner and their challenge to BOLI's damages award. We agree with the Kleins, however, that the evidence does not support BOLI's conclusion that they violated ORS 659A.409. Accordingly, we reverse the order as to that determination and the related grant of injunctive relief. BOLI's order is otherwise affirmed.
I. BACKGROUND
We will discuss the relevant evidence and factual findings in greater detail within our discussion of particular assignments of error, but the following overview provides context for that later discussion.[1] The complainants, Rachel Bowman-Cryer and Laurel Bowman-Cryer, met in 2004 and had long considered themselves a couple. In 2012, they decided to marry.
As part of the wedding planning, Rachel and her mother, Cheryl, attended a Portland bridal show.[2] Melissa Klein had a booth at that bridal show, and she advertised wedding cakes made by her bakery business, Sweetcakes. Rachel and Cheryl visited the booth and told Melissa that they would like to order a cake from her. Rachel and Cheryl were already familiar with Sweetcakes; two years earlier, *512 Sweetcakes had designed, created, and decorated a wedding cake for Cheryl's wedding, paid for by Rachel.
After the bridal show, on January 17, 2013, Rachel and Cheryl visited the Sweetcakes bakery shop in Gresham for a cake-tasting appointment, intending to order a wedding cake. At the time of the appointment, Melissa was at home providing childcare, so her husband, Aaron, conducted the tasting.
During that tasting, Aaron asked for the names of the bride and groom. Rachel told him that there were two brides and that their names were Rachel and Laurel. At that point, Aaron stated that he was sorry, but that Sweetcakes did not make wedding cakes for same-sex ceremonies because of his and Melissa's religious convictions. Rachel began crying, and Cheryl took her by the arm and walked her out of the shop. On the way to their car, Rachel became "hysterical" and kept apologizing to her mother, feeling that she had humiliated her.
*1058 Cheryl consoled Rachel once they were in their car, and she assured her that they would find someone to make the wedding cake. Cheryl drove a short distance away, but then turned around and returned to Sweetcakes. This time, Cheryl reentered the shop by herself to talk with Aaron. During their conversation, Cheryl told Aaron that she had previously shared his thinking about homosexuality, but that her "truth had changed" as a result of having "two gay children." In response, Aaron quoted a Bible passage from the Book of Leviticus, stating, "You shall not lie with a male as one lies with a female; it is an abomination." Cheryl left and returned to the car, where Rachel had remained, "holding [her] head in her hands, just bawling."
When Cheryl returned to the car, she told Rachel that Aaron had called her "an abomination," which further upset Rachel. Rachel later said that "[i]t made me feel like they were saying God made a mistake when he made me, that I wasn't supposed to be, that I wasn't supposed to love or be loved or have a family or live a good life and one day go to heaven."
When Rachel and Cheryl arrived home, Cheryl told Laurel what had happened. Laurel, who had been raised *513 Catholic, recognized the "abomination" reference from Leviticus and felt shame and anger. Rachel was inconsolable, which made Laurel even angrier. Later that same night, Laurel filled out an online complaint form with the Oregon Department of Justice (DOJ), describing the denial of service at Sweetcakes.
In addition to the DOJ complaint, Laurel eventually filed a complaint with BOLI, as did Rachel, alleging that the Kleins had refused to make them a wedding cake because of their sexual orientation. BOLI initiated an investigation.
Meanwhile, the controversy had become the subject of significant media attention. The Kleins were interviewed by, among others, the Christian Broadcast Network (CBN) and later by a radio talk show host, Tony Perkins. In the CBN interview, which was broadcast in September 2013, the Kleins explained that they did not want to participate in celebrating a same-sex marriage, wanted to live their lives in the service of God, and that, although they did not want to see their bakery business go "belly up," they had "faith in the Lord and he's taken care of us up to this point and I'm sure he will in the future." The CBN broadcast also showed a handwritten sign, taped to the inside of the bakery's front window, which stated:
"Closed but still in business. You can reach me by email or facebook. www.sweetcakesweb.com or Sweetcakes by Melissa facebook page. New phone number will be provided on my website and facebook. This fight is not over. We will continue to stand strong. Your religious freedom is becoming not free anymore. This is ridiculous that we cannot practice our faith. The LORD is good and we will continue to serve HIM with all our heart [heart symbol]."
(Uppercase and underscoring in original; spacing altered).
In the Perkins interview, which occurred in February 2014, Aaron explained that he and Melissa "had a feeling that [requests for same-sex wedding cakes were] going to become an issue" and that they had discussed the issue. During the interview, Aaron stated that "it was one of those situations where we said 'well I can see it is going to become an issue but we have to stand firm. It's our belief and we have a right to it, you know.' "
*514 BOLI's investigation determined that substantial evidence supported the complaints, and the agency eventually issued formal charges against the Kleins that described the initial refusal of service as well as the Kleins' subsequent participation in the CBN broadcast and Perkins interview. Specifically, BOLI alleged that the Kleins had violated ORS 659A.403, which entitles all persons "to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, without any distinction, discrimination or restriction on account of *** sexual orientation," ORS 659A.403(1), and further makes it "an unlawful practice for any person to deny full and equal accommodations, advantages, facilities and privileges of any place of public accommodation in violation of this section," ORS 659A.403(3).
*1059 BOLI further alleged that the Kleins' subsequent statements had violated another provision of the state's public accommodations laws, ORS 656A.409, which makes it unlawful to communicate an intention to discriminate in the future on account of sexual orientation.
After the issuance of formal charges, BOLI designated an ALJ to handle the contested case proceedings, and the Kleins and BOLI engaged in extensive motions practice before the ALJ. Among those motions, the Kleins sought to disqualify BOLI's commissioner, Brad Avakian, on the ground that he was biased against them, as evidenced by his public statements about the cake controversy. In a Facebook post shortly after Laurel filed the DOJ complaint, Avakian had provided a link to a story on www.kgw.com related to the refusal of service; in that post, he wrote, "Everyone has a right to their religious beliefs, but that doesn't mean they can disobey laws that are already in place. Having one set of rules for everybody ensures that people are treated fairly as they go about their daily lives." Later, shortly after the first of the BOLI complaints was filed, an article in The Oregonian quoted Avakian as saying that "[e]veryone is entitled to their own beliefs, but that doesn't mean that folks have the right to discriminate." According to the Kleins, those statements and others indicated that Avakian had prejudged their case before the hearing. The ALJ disagreed and denied the motion to disqualify.
*515 The Kleins and BOLI also filed cross-motions for summary judgment on multiple issues involving the merits of the case, including, as relevant on judicial review: (1) whether the complainants were denied service "on account of" their sexual orientation for purposes of Oregon's public accommodation laws; (2) if so, whether the application of those laws violates the Kleins' rights to free expression and religious worship under the state and federal constitutions; and (3) whether Aaron Klein's statements during the CBN and Perkins interviews, and the note on the Sweetcakes window, were the kinds of statements of a future intention to discriminate that are prohibited by ORS 659A.409. In an interim order on the cross-motions, the ALJ agreed with BOLI on the first two questions, concluding that the Kleins' refusal to provide a wedding cake violated ORS 659A.403, and that the statute was constitutional, both facially and as applied under the circumstances.[3] However, the ALJ agreed with the Kleins that Aaron's statements during the CBN and Perkins interviews had not been prospective; rather, the ALJ determined that those statements "are properly construed as the recounting of past events that led to the present Charges being filed," and therefore did not violate ORS 659A.409.
After the ALJ's rulings on the various motions, only the issue of damages remained to be decided at a hearing. BOLI alleged that each complainant was claiming damages of "at least $75,000," and it adduced evidence at the hearing-through testimony of the complainants and others-concerning emotional harm that the complainants suffered in the wake of the Kleins' refusal to make their wedding cake. During closing arguments, BOLI also asked *516 that the ALJ award damages for the distress that the complainants suffered as a result of media and social-media attention after the denial of service. In response, the Kleins argued that the complainants were not credible but that, even if the ALJ were to find them credible, their emotional distress was attributable to sources other than the denial of service that were not lawful bases for a damages award, such as media attention and family conflicts. The Kleins also argued that the amount of damages requested by BOLI far exceeded *1060 anything that the agency had previously sought for similar violations.
After six days of testimony and argument regarding the damages issue, the ALJ issued a proposed final order that encompassed his earlier summary judgment and procedural rulings and also addressed the question of damages. With respect to damages, the ALJ found that Rachel had testified credibly about her emotional distress, but that Laurel had not been present at the cake refusal and had, in some respects, exaggerated the extent and severity of her emotional suffering. The ALJ concluded that there was no basis in law for awarding damages to the complainants for their emotional suffering caused by media and social-media attention. Ultimately, the ALJ determined that $75,000 was an appropriate award to compensate Rachel for her suffering as a result of the denial of service, and that a lesser amount, $60,000, was appropriate to compensate Laurel.
Both the Kleins and the agency filed exceptions to the ALJ's proposed final order. BOLI, through its commissioner, Avakian, then issued its final order that, for the most part, was consistent with the ALJ's reasoning in his proposed order. Specifically, BOLI's final order affirmed the ALJ's determinations that the Kleins violated ORS 659A.403, it affirmed the ALJ's conclusion that application of that statute did not violate the Kleins' constitutional rights, and it affirmed the damages awards. However, the final order departed from the ALJ's determination in one respect: whether the Kleins had violated ORS 659A.409 by conveying an intention to discriminate in the future. On that question, the final order determined that, based on Aaron's statements during the CBN and Perkins interviews, and the handwritten sign taped to the bakery's window (stating *517 that the "fight is not over" and vowing to "continue to stand strong"), the Kleins had conveyed an intention to unlawfully discriminate in the future by refusing service based on sexual orientation. Thus, BOLI reversed the ALJ's ruling on that matter and concluded that the Kleins violated ORS 659A.409 ; but, BOLI did not award any damages based on that particular violation "because there is no evidence in the record that Complainants experienced any mental, emotional, or physical suffering because of it." This petition for judicial review followed.
II. ANALYSIS
In their petition, the Kleins raise four assignments of error. In their first assignment, they argue that BOLI erred by applying ORS 659A.403 to their refusal to make the wedding cake. Within that assignment, they argue that BOLI misinterpreted the statute to apply to the refusal; alternatively, they argue that, as applied under these circumstances, the statute abridges their rights to freedom of expression and religious exercise under the federal and state constitutions. In their second assignment, the Kleins argue that their due process rights were violated by the commissioner's failure to recuse himself. The Kleins' third assignment asserts that BOLI's damages award is not supported by substantial evidence or substantial reason. And, in their fourth assignment, they argue that BOLI erred by applying ORS 659A.409 because their statements after the refusal did not communicate an intention to discriminate in the future. We address each assignment of error in turn.
A. First Assignment: Interpretation and Application of ORS 659A.403
1. Meaning and scope of ORS 659A.403
In their first assignment of error, the Kleins argue that BOLI misinterpreted ORS 659A.403 -specifically, what it means to deny equal service "on account of" sexual orientation. According to the Kleins, they did not decline service to the complainants "on account of" their sexual orientation; rather, "they declined to facilitate the celebration of a union that conveys messages about marriage to which they do not [subscribe] and that contravene their religious *518 beliefs." BOLI rejected that argument, reasoning that the Kleins' "refusal to provide a wedding cake for Complainants because it was for their same-sex wedding was synonymous with refusing to provide a cake because of Complainants' sexual orientation." We, like BOLI, are not persuaded that the text, context, or history of ORS 659A.403 contemplates the distinction proposed by the Kleins. *1061 We review BOLI's interpretation of ORS 659A.403 for legal error, without deference to the agency's construction of the statute. ORS 183.482(8)(a) ; see Multnomah County Sheriff's Office v. Edwards , 361 Or. 761, 770-71, 399 P.3d 969 (2017) (where statutory terms are inexact, courts determine the meaning of the statute most likely intended by the legislature that enacted it, without any deference to an agency charged with enforcing the statute). To determine the legislature's intended meaning of ORS 659A.403, we use the analytic framework set forth in State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009), whereby we look to the text of the statute in its context, along with any helpful legislative history.
The text of ORS 659A.403(1) leaves little doubt as to its breadth and operation. It provides, in full:
"(1) Except as provided in subsection (2) of this section, all persons within the jurisdiction of this state are entitled to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, without any distinction, discrimination or restriction on account of race, color, religion, sex, sexual orientation , national origin, marital status or age if the individual is of age, as described in this section, or older."
(Emphases added.) The phrase "on account of" is unambiguous: In ordinary usage, it is synonymous with "by reason of" or "because of." Webster's Third New Int'l Dictionary 13 (unabridged ed. 2002); id. at 194 (defining "because of" as "by reason of : on account of"). And it has long been understood to carry that meaning in the context of antidiscrimination statutes. E.g. , 18 USC § 242 (1948) (making it unlawful to deprive a person of "any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or *519 penalties, on account of such inhabitant being an alien, or by reason of his color, or race" (emphases added)).
Thus, by its plain terms, the statute requires only that the denial of full and equal accommodations be causally connected to the protected characteristic or status-in this case, "sexual orientation," which is defined to mean "an individual's actual or perceived heterosexuality, homosexuality, bisexuality or gender identity, regardless of whether the individual's gender identity, appearance, expression or behavior differs from that traditionally associated with the individual's sex at birth." Former ORS 174.100(6) (2013), renumbered as ORS 174.100(7) (2015).[4] Accord Hopper v. SAIF , 265 Or. App. 465, 470, 336 P.3d 530 (2014) (explaining that, because the ordinary meaning of the term "for" in context was "because of" or "on account of," the workers' compensation statute at issue "requires a worker to prove that any failure to cooperate was because of-in other words, causally connected to -reasons beyond the worker's control" (first emphasis in original; second emphasis added)); Elk Creek Management Co. v. Gilbert , 353 Or. 565, 580-81, 303 P.3d 929 (2013) (explaining that antidiscrimination statutes often use the term "retaliation" "in conjunction with the word 'because' or other words that require a causal connection between one party's acts and another party's protected activity" (emphasis added)).
In this case, Sweetcakes provides a service-making wedding cakes-to heterosexual couples who intend to wed, but it denies the service to same-sex couples who likewise intend to wed. Under any plausible construction of the plain text of ORS 659A.403, that denial of equal service is "on account of," or causally connected to, the sexual orientation of the couple seeking to purchase the Kleins' wedding-cake service.
The Kleins do not point to any text in the statute or provide any context or legislative history suggesting that we should depart from the ordinary meaning of those words. What they argue instead is that the statute is silent as to *520 whether it encompasses "gay conduct" as opposed to sexual orientation. The Kleins state that they are willing to serve homosexual customers, so long as those customers do not use the Kleins' cakes in celebration of same-sex weddings. As such, *1062 according to the Kleins, they do not discriminate against same-sex couples "on account of" their status ; rather, they simply refuse to provide certain services that those same-sex couples want. The Kleins contend that BOLI's "broad equation of celebrations (weddings) of gay conduct (marriage) with gay status rewrites and expands Oregon's public accommodations law."
We see no evidence that the drafters of Oregon's public accommodations laws intended that type of distinction between status and conduct. First, there is no reason to believe that the legislature intended a "status/conduct" distinction specifically with regard to the subject of "sexual orientation." When the legislature in 2007 added "sexual orientation" to the list of protected characteristics in ORS 659A.403, Or. Laws 2007, ch. 100, § 5, it was unquestionably aware of the unequal treatment that gays and lesbians faced in securing the same rights and benefits as heterosexual couples in committed relationships. During the same session that the legislature amended ORS 659A.403 (and other antidiscrimination statutes) to include "sexual orientation," it adopted the Oregon Family Fairness Act, which recognized the "numerous obstacles" that gay and lesbian couples faced and was intended to "extend[ ] benefits, protections and responsibilities to committed same-sex partners and their children that are comparable to those provided to married individuals and their children by the laws of this state." Or. Laws 2007, ch. 99, §§ 2(3), (5). To that end, section 9 of that law provided:
"Any privilege, immunity, right or benefit granted by statute, administrative or court rule, policy, common law or any other law to an individual because the individual is or was married, or because the individual is or was an in-law in a specified way to another individual, is granted on equivalent terms, substantive and procedural, to an individual because the individual is or was in a domestic partnership or because the individual is or was, based on a domestic partnership, related in a specified way to another individual."
*521 Or. Laws 2007, ch. 99, § 9(1). The Kleins have not provided us with any persuasive explanation for why the legislature would have intended to grant equal privileges and immunities to individuals in same-sex relationships while simultaneously excepting those committed relationships from the protections of ORS 659A.403.[5]
Nor does the Kleins' proposed distinction find support in the context or history of ORS 659A.403 more generally. As originally enacted in 1953, the statute (then numbered ORS 30.670 ) prohibited "any distinction, discrimination or restriction on account of race, religion, color or national origin." Or. Laws 1953, ch. 495, § 1. One of the purposes of the statute, the Supreme Court has observed, was "to prevent 'operators and owners of businesses catering to the general public to subject Negroes to oppression and humiliation.' " Schwenk v. Boy Scouts of America , 275 Or. 327, 332, 551 P.2d 465 (1976) (quoting a statement by one of the principal sponsors of the statute (emphasis removed)). Yet, under the distinction proposed by the Kleins, owners and operators of businesses could continue to oppress and humiliate black people simply by recasting their bias in terms of conduct rather than race. For instance, a restaurant could refuse to serve an interracial couple, not on account of the race of either customer, but on account of the conduct-interracial dating-to which the proprietor objected. In the absence of any textual or contextual support, or legislative history *1063 on that point, we decline to construe ORS 659A.403 in a way that would so fundamentally undermine its purpose. See King v. Greyhound Lines, Inc. , 61 Or. App. 197, 203, 656 P.2d 349 (1982) (adopting an interpretation of Oregon's *522 public accommodation laws that recognizes that "the chief harm resulting from the practice of discrimination by establishments serving the general public is not the monetary loss of a commercial transaction or the inconvenience of limited access but, rather, the greater evil of unequal treatment, which is the injury to an individual's sense of self-worth and personal integrity").
Tellingly, the Kleins' argument for distinguishing between "gay conduct" and sexual orientation is rooted in principles that they derive from United States Supreme Court cases rather than anything in the text, context, or history of ORS 659A.403. Specifically, the Kleins draw heavily on the Supreme Court's reasoning in Bray v. Alexandria Women's Health Clinic , 506 U.S. 263, 113 S.Ct. 753, 122 L. Ed. 2d 34 (1993), which concerned the viability of a federal cause of action under 42 USC section 1985(3) against persons obstructing access to abortion clinics. In that case, the Supreme Court addressed, among other things, whether the petitioners' opposition to abortion reflected an animus against women in general-that is, whether, because abortion is "an activity engaged in only by women, to disfavor it is ipso facto to discriminate invidiously against women as a class." Id. at 271, 113 S.Ct. 753 (footnote omitted).
In rejecting that theory of ipso facto discrimination, the Court observed:
"Some activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed. A tax on wearing yarmulkes is a tax on Jews. But opposition to voluntary abortion cannot possibly be considered such an irrational surrogate for opposition to (or paternalism towards) women. Whatever one thinks of abortion, it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning), women as a class-as is evident from the fact that men and women are on both sides of the issue, just as men and women are on both sides of petitioners' unlawful demonstrations."
Id. at 270, 113 S.Ct. 753.
*523 The Kleins argue that "[t]he same is true here. Whatever one thinks of same-sex weddings, there are respectable reasons for not wanting to facilitate them." They contend that BOLI simply "ignores Bray " and that BOLI's construction of ORS 659A.403"fails the test for equating conduct with status" that the Supreme Court announced in that case.
Bray , which involved a federal statute, does not inform the question of what the Oregon legislature intended when it enacted ORS 659A.403. But beyond that, Bray does not articulate a relevant test for analyzing the issue presented in this case. Bray addressed the inferences that could be drawn from opposition to abortion as a "surrogate" for sex-based animus, and it was in that context that the Supreme Court described "irrational object[s] of disfavor" that "happen to be engaged in exclusively or predominantly by a particular class of people," 506 U.S. at 270, 113 S.Ct. 753, such that intent to discriminate against that class can be presumed.
Here, by contrast, there is no surrogate. The Kleins refused to make a wedding cake for the complainants precisely and expressly because of the relationship between sexual orientation and the conduct at issue (a wedding). And, where a close relationship between status and conduct exists, the Supreme Court has repeatedly rejected the type of distinction urged by the Kleins. See Christian Legal Soc. Chapter of Univ. of Cal., Hastings College of Law v. Martinez , 561 U.S. 661, 689, 130 S.Ct. 2971, 177 L. Ed. 2d 838 (2010) ( "[Christian Legal Society] contends that it does not exclude individuals because of sexual orientation, but rather on the basis of a conjunction of conduct and the belief that the conduct is not wrong. Our decisions have declined to distinguish between status and conduct in this context." (Citation and internal quotation marks omitted.));
*1064 Lawrence v. Texas , 539 U.S. 558, 575, 123 S.Ct. 2472, 156 L. Ed. 2d 508 (2003) ("When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres."). We therefore reject the Kleins' proposed distinction between status and conduct, and we hold that their refusal to serve the complainants is the type of discrimination "on account of *524 * * * sexual orientation" that falls within the plain meaning of ORS 659A.403.[6]
The reasons for the Kleins' discrimination on account of sexual orientation-regardless of whether they are "common and respectable" within the meaning of Bray - raise questions of constitutional law, not statutory interpretation. The Kleins, in the remainder of their argument concerning the construction of ORS 659A.403, urge us to consider those constitutional questions and to interpret the statute in a way that avoids running afoul of the "Speech and Religion Clauses of the Oregon and United States constitutions." See generally State v. McNally , 361 Or. 314, 337, 392 P.3d 721 (2017) (describing the interpretive canon by which courts will "avoid an interpretation that would raise constitutional problems in application, if another reasonable interpretation of the statute would not"). However, that canon applies only where the court is faced with competing plausible constructions of the statute. See State v. Lane , 357 Or. 619, 637, 355 P.3d 914 (2015) ("The canon of interpretation that counsels avoidance of unconstitutionality applies only when a disputed provision remains unclear after examination of its text in context and in light of its enactment history."). Here, the Kleins have not made that threshold showing of ambiguity. Accordingly, we affirm BOLI's order with regard to its construction of ORS 659A.403, and we turn to the merits of the Kleins' constitutional arguments.
2. Constitutional challenges to ORS 659A.403
The Kleins invoke both the United States and the Oregon constitutions in arguing that the final order violates their rights to free expression and the free exercise of their religion. Oregon courts generally seek to resolve arguments under the state constitution before turning to the federal constitution. See State v. Babson , 355 Or. 383, 432-33, 326 P.3d 559 (2014) (discussing policy reasons for analyzing state constitutional claims first). In this case, however, the *525 Kleins draw almost entirely on well-developed federal constitutional principles, and they do not meaningfully develop any independent state constitutional theories. Accordingly, in the discussion that follows, we address the Kleins' federal constitutional arguments first and their state arguments second. See Church at 295 S. 18th St. v. Employment Dept. , 175 Or. App. 114, 123 n. 2, 28 P.3d 1185, rev. den. , 333 Or. 73, 36 P.3d 974 (2001) (noting that "[t]he Supreme Court likewise does not always pause to consider state constitutional arguments before addressing federal constitutional arguments, particularly when the parties have not asserted any independent state constitutional analysis"); see also Neumann v. Liles , 358 Or. 706, 716 n. 6, 369 P.3d 1117 (2016) ("Ordinarily, we would look to our state constitution before addressing any federal constitutional issues. As noted, however, the parties to this case have argued this issue solely under the First Amendment and have not invoked Article I, section 8, of the Oregon Constitution.").
a. Free expression
The Kleins argue that BOLI's final order violates their First Amendment right to freedom of speech. BOLI argues that the order simply enforces ORS 659A.403, a content-neutral regulation of conduct that does not implicate the First Amendment at all. And each side argues that United States Supreme Court precedent is decisively in its favor.
The issues before us arise at the intersection of two competing principles: the government's interest in promoting full access to *1065 the state's economic life for all of its citizens, which is expressed in public accommodations statutes like ORS 659A.403, and an individual's First Amendment right not to be compelled to express or associate with ideas with which she disagrees. Although the Supreme Court has grappled with that intersection before, it has not yet decided a case in this particular context, where the public accommodation at issue is a retail business selling a service, like cake-making, that is asserted to involve artistic expression.[7] *526 It is that asserted artistic element that complicates the First Amendment analysis-and, ultimately, distinguishes this case from the precedents on which the parties rely. Generally speaking, the First Amendment does not prohibit government regulation of "commerce or conduct" whenever such regulation indirectly burdens speech. Sorrell v. IMS Health Inc. , 564 U.S. 552, 567, 131 S.Ct. 2653, 180 L. Ed. 2d 544 (2011). When, however, the government regulates activity that involves a "significant expressive element," some degree of First Amendment scrutiny is warranted. Arcara v. Cloud Books, Inc. , 478 U.S. 697, 706, 106 S.Ct. 3172, 92 L. Ed. 2d 568 (1986) ; id. at 705, 106 S.Ct. 3172 (reasoning that the "crucial distinction" between government actions that trigger First Amendment scrutiny and those that do not is whether the regulated activity "manifests" an "element of protected expression").
In the discussion that follows, we conclude that the Kleins have not demonstrated that their wedding cakes invariably constitute fully protected speech, art, or other expression, and we therefore reject the Kleins' position that we must subject BOLI's order to strict scrutiny under the First Amendment. At most, the Kleins have shown that their cake-making business includes some arguably expressive elements as well as non-expressive elements, so as to trigger intermediate scrutiny. We assume (without deciding) that that is true, and then conclude that BOLI's order nonetheless survives intermediate scrutiny because any burden on the Kleins' expressive activities is no greater than is essential to further Oregon's substantial interest in promoting the ability of its citizens to participate equally in the marketplace without regard to sexual orientation.
(1) "Public accommodations" and the First Amendment
Oregon enacted its Public Accommodation Act in 1953. See Or. Laws 1953, ch. 495. The original act guaranteed the provision of "full and equal accommodations, advantages, facilities and privileges * * * without any distinction, *527 discrimination or restriction on account of race, religion, color, or national origin." Former ORS 30.670 (1953), renumbered as ORS 659A.403 (2001). It applied to "any hotel, motel or motor court, any place offering to the public food or drink for consumption on the premises, or any place offering to the public entertainment, recreation or amusement." Former ORS 30.675 (1953), renumbered as ORS 659A.400 (2001). Oregon's statute was thus similar in scope to Title II of the federal Civil Rights Act of 1964, which prohibits discrimination "on the ground of race, color, religion, or national origin" in three broad categories of public accommodations: those that provide lodging to transient guests, those that sell food for consumption on the premises, and those that host "exhibition[s] or entertainment," such as theaters and sports arenas. Pub. L. 88-352, Title II, § 201, 78 Stat. 243 (1964), codified as 42 USC § 2000a(b). When the United States Supreme Court upheld the public accommodations provisions of Title II in 1964, it observed that the constitutionality of state public accommodations laws at that point had remained "unquestioned," citing previous instances in which it had "rejected the claim that the prohibition of racial discrimination in public accommodations interferes with personal liberty." Atlanta Motel v. United States , 379 U.S. 241, 260-61, 85 S.Ct. 348, 13 L. Ed. 2d 258 (1964). *1066 Over two decades, the Oregon legislature incrementally expanded the definition of "place of public accommodation" to include "trailer park[s]" and "campground[s]," Or. Laws 1957 ch. 724, § 1, and then to places "offering to the public food or drink for consumption on or off the premises," Or. Laws 1961, ch. 247, § 1 (emphasis added). Then, in 1973, the legislature significantly expanded the definition to include "any place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements or otherwise," subject to an exception for "any institution, bona fide club or place of accommodation which is in its nature distinctly private." Or. Laws 1973, ch. 714, § 2 (emphasis added). Other states similarly enlarged the scope of their public-accommodations laws over time. See, e.g. , Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc. , 515 U.S. 557, 571-72, 115 S.Ct. 2338, 132 L. Ed. 2d 487 (1995) (describing the ways in *528 which the Massachusetts legislature had "broaden[ed] the scope of" the state's public accommodations law); Roberts v. United States Jaycees , 468 U.S. 609, 624, 104 S.Ct. 3244, 82 L. Ed. 2d 462 (1984) (observing that Minnesota had "progressively broadened the scope of its public accommodations law in the years since it was first enacted, both with respect to the number and type of covered facilities and with respect to the groups against whom discrimination is forbidden").
First Amendment challenges to the application of public-accommodations laws-and other forms of anti-discrimination laws-have been mostly unsuccessful. See, e.g. , Roberts , 468 U.S. at 625-29, 104 S.Ct. 3244 (rejecting argument that a private, commercial association had a First Amendment right to exclude women from full membership); Hishon v. King & Spalding , 467 U.S. 69, 78, 104 S.Ct. 2229, 81 L. Ed. 2d 59 (1984) (rejecting law firm's claim that prohibiting the firm from discriminating on the basis of gender in making partnership decisions violated members' First Amendment rights to free expression and association); Runyon v. McCrary , 427 U.S. 160, 175-76, 96 S.Ct. 2586, 49 L. Ed. 2d 415 (1976) (rejecting private schools' claim that they had a First Amendment associational right to discriminate on the basis of race in admitting students). The United States Supreme Court has repeatedly acknowledged that public accommodations statutes in particular are "well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination." Hurley , 515 U.S. at 572, 115 S.Ct. 2338. The Court has further acknowledged that states enjoy "broad authority to create rights of public access on behalf of [their] citizens," in order to ensure "wide participation in political, economic, and cultural life" and to prevent the "stigmatizing injury" and "the denial of equal opportunities" that accompanies invidious discrimination in public accommodations. Roberts , 468 U.S. at 625, 104 S.Ct. 3244. And the Court has recognized a state's interest in preventing the "unique evils" that stem from "invidious discrimination in the distribution of publicly available goods, services, and other advantages." Id. at 628, 104 S.Ct. 3244.
However, as states adopted more expansive definitions of "places of public accommodation," their anti-discrimination statutes began to reach entities that were *529 different in kind from the commercial establishments that were the original target of public accommodations laws. As a result, on two occasions, the Court held that the application of such laws violated the First Amendment.
First, in Hurley , the court held that Massachusetts's public accommodations law could not be applied to require a St. Patrick's Day parade organizer to include a gay-rights group in its parade. 515 U.S. at 573, 115 S.Ct. 2338. Observing that state public accommodations laws do not, "as a general matter, violate the First or Fourteenth Amendments," the Court went on to conclude that the Massachusetts law had been "applied in a peculiar way" to a private parade, a result that "essentially requir[ed]" the parade organizers to "alter the expressive content of their parade" by accommodating a message (of support for gay rights) that they did not want to include. Id. at 572-73, 115 S.Ct. 2338 (emphasis added). The Court further reasoned that such an application of the statute "had the effect of declaring the [parade] sponsors' speech itself to be the public accommodation,"
*1067 which violated "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." Id. at 573, 115 S.Ct. 2338.
Following Hurley , the Court decided Boy Scouts of America v. Dale , 530 U.S. 640, 120 S.Ct. 2446, 147 L. Ed. 2d 554 (2000) ( Dale ), in which it held that applying New Jersey's public accommodations law to require the Boy Scouts to admit a gay scoutmaster violated the group's First Amendment right to freedom of association. The Court observed that, over time, public accommodations laws had been expanded to cover more than just "traditional places of public accommodation-like inns and trains." Id. at 656, 120 S.Ct. 2446. According to the Court, New Jersey's definition of a "place of public accommodation" was "extremely broad," particularly because the state had "applied its public accommodations law to a private entity without even attempting to tie the term 'place' to a physical location." Id. at 657, 120 S.Ct. 2446. The court distinguished Dale from prior cases in which it held that public accommodations laws posed no First Amendment problem, observing that, in those prior cases, the law's enforcement did not "materially interfere with the ideas that the organization sought to express." Id.
*530 Thus, Hurley and Dale demonstrate that the First Amendment may stand as a barrier to the application of state public accommodations laws when such laws are applied to "peculiar" circumstances outside of the usual commercial context. See Dale , 530 U.S. at 657, 120 S.Ct. 2446 ("As the definition of 'public accommodation' has expanded from clearly commercial entities, such as restaurants, bars, and hotels, to membership organizations such as the Boy Scouts, the potential for conflict between state public accommodations laws and the First Amendment rights of organizations has increased.").
In this case, the Kleins concede that Sweetcakes is a "place of public accommodation" under Oregon law because it is a retail bakery open to the public. But the Kleins contend that, as in Hurley and Dale , application of ORS 659A.403 in this case violates their First Amendment rights.
(2) First Amendment precedent
BOLI and the Kleins offer competing United States Supreme Court precedent that, they argue, clearly requires a result in their respective favors. We begin our analysis by explaining why we do not regard the authorities cited by the parties as controlling.
The Kleins argue that the effect of BOLI's final order is to compel them to express a message-a celebration of same-sex marriage-with which they disagree. They primarily draw on two interrelated lines of First Amendment cases that, they contend, preclude the application of ORS 659A.403 here.
First, the Kleins rely on cases holding that the government may not compel a person to speak or promote a government message with which the speaker does not agree. See, e.g. , Board of Education v. Barnette , 319 U.S. 624, 63 S.Ct. 1178, 87 L. Ed. 1628 (1943) (holding that a state may not sanction a public-school student or his parents for the student's refusal to recite the Pledge of Allegiance or salute the flag of the United States); Wooley v. Maynard , 430 U.S. 705, 97 S.Ct. 1428, 51 L. Ed. 2d 752 (1977) (holding that New Hampshire could not force a person to display the "Live Free or Die" state motto on his license plate).
*531 We do not consider that line of cases to be helpful here. In "compelled speech" cases like Barnette and Wooley , the government prescribed a specific message that the individual was required to express. ORS 659A.403 does nothing of the sort; it is a content-neutral regulation that is not directed at expression at all. It does not even regulate cake-making; it simply prohibits the refusal of service based on membership in a protected class. The United States Supreme Court has repeatedly held that such content-neutral regulations-although they may have incidental effects on an individual's expression-are an altogether different, and generally permissible, species of government action than a regulation of speech . See Rumsfeld v. Forum for Academic & Institutional Rights, Inc. , 547 U.S. 47, 62, 126 S.Ct. 1297, 164 L. Ed. 2d 156 (2006) ( FAIR ) ("[I]t has never been deemed an abridgement of *1068 freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." (Internal quotation marks omitted.)); R. A. V. v. St. Paul , 505 U.S. 377, 385, 112 S.Ct. 2538, 120 L. Ed. 2d 305 (1992) ("We have long held * * * that nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses * * *."). In short, we reject the Kleins' analogy of this case to Barnette and Wooley .
Second, the Kleins rely heavily on Hurley and Dale , which, as discussed above, invalidated the application of public accommodations statutes in "peculiar" circumstances outside of the usual commercial context. The difficulty with that analogy is that this case does involve the usual commercial context; Sweetcakes is not a private parade or membership organization, and it is hardly "peculiar," as that term was used in Hurley , to apply ORS 659A.403 to a retail bakery like Sweetcakes that is open to the public and that exists for the purpose of engaging in commercial transactions. Indeed, the Kleins accept the premise that Sweetcakes is a place of public accommodation under Oregon law, and that, as such, it must generally open its doors to customers of all sexual orientations, regardless of the Kleins' religious views about homosexuality. Thus, if the Kleins are to succeed in avoiding compliance with the statute, it cannot be because *532 their activity occurs outside the ordinary commercial context that the government has wide latitude to regulate, as was the case in Hurley and Dale . The Kleins must find support elsewhere.
In BOLI's view, on the other hand, the Kleins' arguments are disposed of by the United States Supreme Court's decision in FAIR . In that case, an association of law schools and law faculty (FAIR) sought to enjoin the enforcement of the Solomon Amendment, a federal law that requires higher-education institutions, as a condition for receiving federal funds, to provide military recruiters with the same access to their campuses as non-military recruiters. 547 U.S. at 52-55, 126 S.Ct. 1297. Because FAIR opposed the military's policy at that time regarding homosexual service-members, FAIR argued that the equal-access requirement violated the schools' First Amendment rights to freedom of speech and association. Id. at 52-53, 126 S.Ct. 1297.
The Court rejected FAIR's compelled-speech argument, reasoning that the Solomon Amendment "neither limits what law schools may say nor requires them to say anything," and, therefore, the law was a "far cry" from the compulsions at issue in Barnette and Wooley . Id. at 60, 62, 126 S.Ct. 1297. The Court acknowledged that compliance with the Solomon Amendment would indirectly require the schools to "speak" in a sense because it would require the schools to send emails and post notices on behalf of the military if they chose to do so for other recruiters. Nevertheless, the Court found it dispositive that the Solomon Amendment did not "dictate the content of the speech at all, which is only 'compelled' if, and to the extent [that,] the school provides such speech for other recruiters." Id. The Court distinguished that situation from those where "the complaining speaker's own message was affected by the speech it was forced to accommodate." Id. at 63-64, 126 S.Ct. 1297 (citing, inter alia , Hurley , 515 U.S. at 568, 115 S.Ct. 2338 ).
In BOLI's view, this case is like FAIR because ORS 659A.403 does not directly compel any speech; even if one considers the Kleins' cake-making to involve some element of expression, the law only compels the Kleins to engage in that expression for same-sex couples "if, and to the extent" that the Kleins do so for the general public.
*533 This case is distinguishable from FAIR , however, in a significant way. Essential to the holding in FAIR was that the schools were not compelled to express a message with which they disagreed. The schools evidently did not assert, nor did the Supreme Court contemplate, that there was a meaningful ideological or expressive component to the emails or notices themselves, which merely conveyed factual information about the presence of recruiters on campus. The Court thus distinguished the case from Barnette and Wooley , cases that addressed the harm that results from true compelled *1069 speech-that is, depriving a person of autonomy as a speaker and "inva [ding]" that person's " 'individual freedom of mind,' " Wooley , 430 U.S. at 714, 97 S.Ct. 1428 (quoting Barnette , 319 U.S. at 637, 63 S.Ct. 1178 ); see Hurley , 515 U.S. at 576, 115 S.Ct. 2338 ("[W]hen dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's right to autonomy over the message is compromised.").
Here, unlike in FAIR , the Kleins very much do object to the substantive content of the expression that they believe would be compelled. They argue that their wedding cakes are works of art that express a celebratory message about the wedding for which they are intended, and that the Kleins cannot be compelled to create that art for a wedding that they do not believe should be celebrated. And there is evidentiary support for the Kleins' view, at least insofar as every wedding cake that they create partially reflects their own creative and aesthetic judgment. Whether that is sufficient to make their cakes "art," the creation of which the government may not compel, is a question to which we will turn below, but even the Kleins' subjective belief that BOLI's order compels them to express a specific message that they ideologically oppose makes this case different from FAIR .
That fact is also what makes this case difficult to compare to other public accommodations cases that the United States Supreme Court has decided. It appears that the Supreme Court has never decided a free-speech challenge to the application of a public accommodations law to a retail establishment selling highly customized, creative goods and services that arguably are in the nature of art or other expression.
*534 To put the problem into sharper focus, we see no reason in principle why the services of a singer, composer, or painter could not fit the definition of a "place of public accommodation" under ORS 659A.400. One can imagine, for example, a person whose business is writing commissioned music or poetry for weddings, or producing a sculpture or portrait of the couple kissing at an altar. One can also imagine such a person who advertises and is willing to sell those services to the general public, but who holds strong religious convictions against same-sex marriage and would feel her "freedom of mind" violated if she were compelled to produce her art for such an occasion. Cf. Barnette , 319 U.S. at 637, 63 S.Ct. 1178. For the Kleins, this is that case. BOLI disagrees that a wedding cake is factually like those other examples, but the legal point that those examples illustrate is that existing public accommodations case law is awkwardly applied to a person whose "business" is artistic expression. The Court has not told us how to apply a requirement of nondiscrimination to an artist.
We believe, moreover, that it is plausible that the United States Supreme Court would hold the First Amendment to be implicated by applying a public accommodations law to require the creation of pure speech or art. If BOLI's order can be understood to compel the Kleins to create pure "expression" that they would not otherwise create, it is possible that the Court would regard BOLI's order as a regulation of content, thus subject to strict scrutiny, the test for regulating fully protected expression. See Hurley , 515 U.S. at 573, 115 S.Ct. 2338 (application of public accommodations statute violated the First Amendment where it "had the effect of declaring the sponsors' speech itself to be the public accommodation," thus infringing on parade organizers' "autonomy to choose the content of [their] own message"); see also Riley v. National Federation of the Blind , 487 U.S. 781, 795-98, 108 S.Ct. 2667, 101 L. Ed. 2d 669 (1988) (explaining that "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech," and subjecting such regulation to "exacting First Amendment scrutiny").
Although the Court has not clearly articulated the extent to which the First Amendment protects visual art *535 and its creation, it has held that the First Amendment covers various forms of artistic expression, including music, Ward v. Rock Against Racism , 491 U.S. 781, 790, 109 S.Ct. 2746, 105 L. Ed. 2d 661 (1989) ; "live entertainment," such as musical and dramatic performances, Schad v. Mount Ephraim , 452 U.S. 61, 65, 101 S.Ct. 2176, 68 L. Ed. 2d 671 (1981) ; and video *1070 games, Brown v. Entertainment Merchants Assn , 564 U.S. 786, 790, 131 S.Ct. 2729, 180 L. Ed. 2d 708 (2011). See also Kaplan v. California , 413 U.S. 115, 119-20, 93 S.Ct. 2680, 37 L. Ed. 2d 492 (1973) ("[P]ictures, films, paintings, drawings, and engravings * * * have First Amendment protection."). The Court has also made clear that a particularized, discernible message is not a prerequisite for First Amendment protection.[8] See Hurley , 515 U.S. at 569, 115 S.Ct. 2338 ("[A] narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a particularized message, would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." (Citation and internal quotation marks omitted.)); see also Ward , 491 U.S. at 790, 109 S.Ct. 2746 (concluding that music is protected expression, due to "its capacity to appeal to the intellect and to the emotions").
In short, although ORS 659A.403 is a content-neutral regulation that is not directed at expression, the Kleins' arguments cannot be dismissed on that ground alone. Rather, we must decide whether the Kleins' cake-making activity is sufficiently expressive, communicative, or artistic so as to implicate the First Amendment, and, if *536 it is, whether BOLI's final order compelling the creation of such expression in a particular circumstance survives First Amendment scrutiny.
(3) Whether these cakes implicate the First Amendment
If, as BOLI argues, the Kleins' wedding cakes are just "food" with no meaningful artistic or communicative component, then, as the foregoing discussion illustrates, BOLI's final order does not implicate the First Amendment; the Kleins' objection to having to "speak" as a result of ORS 659A.403 is no more powerful than it would be coming from the seller of a ham sandwich. On the other hand, if and to the extent that the Kleins' wedding cakes constitute artistic or communicative expression, then the First Amendment is implicated by BOLI's final order. In short, we must decide whether the act that the Kleins refused to perform-to design and create a wedding cake-is "sufficiently imbued with elements of communication" so as to "fall within the scope" of the First Amendment. Spence v. Washington , 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L. Ed. 2d 842 (1974).
On this point, BOLI makes a threshold argument that we must address, which is that, because the Kleins refused service to Rachel and Laurel before even finding out what kind of cake the couple wanted, there is no basis for assessing the "artistic" component of whatever cake might have resulted. For all we know, BOLI reasons, Rachel and Laurel might have wanted a standardized cake that would not have involved any meaningful expressive activity on the part of the Kleins. However, we believe the fair interpretation of this record is that the Kleins do not offer such "standardized" or "off the shelf" wedding cakes; they testified that their practice for creating wedding cakes includes a collaborative and customized design process that is individual to the customer. According to the Kleins, they intend-and their "clients expect"-that "each cake will be uniquely crafted to be a statement of each customer's personality, physical tastes, theme and desires, as well as their palate." According to Melissa, she "almost never make[s] a cake without creating a unique *1071 element of style and *537 customization." Furthermore, the complainants expressly stated that they wanted a cake "like" the one that the Kleins had created for Rachel's mother's wedding, which was a custom-designed cake. On this record, we therefore assume that any cake that the Kleins made for Rachel and Laurel would have followed the Kleins' customary practice.
Consequently, the question is whether that customary practice, and its end product, are in the nature of "art." As noted above, if the ultimate effect of BOLI's order is to compel the Kleins to create something akin to pure speech, then BOLI's order may be subject to strict scrutiny. If, on the other hand, the Kleins' cake-making retail business involves, at most, both expressive and non-expressive components, and if Oregon's interest in enforcing ORS 659A.403 is unrelated to the content of the expressive components of a wedding cake, then BOLI's order need only survive intermediate scrutiny to comport with the First Amendment. See United States v. O'Brien , 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L. Ed. 2d 672 (1968) ("[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."); see also Turner Broadcasting System, Inc. v. FCC , 512 U.S. 622, 662, 114 S.Ct. 2445, 129 L. Ed. 2d 497 (1994) (applying intermediate scrutiny to a content-neutral regulation that compelled cable operators to carry certain channels).
The record reflects that the Kleins' wedding cakes follow a collaborative design process through which Melissa uses her customers' preferences to develop a custom design, including choices as to "color," "style," and "other decorative detail." Melissa shows customers previous designs "as inspiration," and she then draws "various designs on sheets of paper" as part of a dialogue with the customer. From that dialogue, Melissa "conceives" and customizes "a variety of decorating suggestions" as she ultimately finalizes the design. Thus, the process does not simply involve the Kleins executing precise instructions from their customers; instead, it is clear that Melissa uses her own design skills and aesthetic judgments.
*538 Therefore, on this record, the Kleins' argument that their products entail artistic expression is entitled to be taken seriously. That being said, we are not persuaded that the Kleins' wedding cakes are entitled to the same level of constitutional protection as pure speech or traditional forms of artistic expression. In order to establish that their wedding cakes are fundamentally pieces of art, it is not enough that the Kleins believe them to be pieces of art. See Nevada Comm'n on Ethics v. Carrigan , 564 U.S. 117, 127, 131 S.Ct. 2343, 180 L. Ed. 2d 150 (2011) ("[T]he fact that a nonsymbolic act is the product of deeply held personal belief-even if the actor would like to convey his deeply held personal belief-does not transform action into First Amendment speech." (Emphasis in original.)); see also Clark v. Community for Creative Non-Violence , 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 82 L. Ed. 2d 221 (1984) (the burden of proving that an activity is protected expression is on the person asserting First Amendment protection for that activity). For First Amendment purposes, the expressive character of a thing must turn not only on how it is subjectively perceived by its maker, but also on how it will be perceived and experienced by others. See Spence , 418 U.S. at 409-10, 94 S.Ct. 2727 (looking to subjective and objective considerations in assessing whether an act constitutes First Amendment protected expression, including "the factual context and environment in which it was undertaken"). Here, although we accept that the Kleins imbue each wedding cake with their own aesthetic choices, they have made no showing that other people will necessarily experience any wedding cake that the Kleins create predominantly as "expression" rather than as food.
Although the Kleins' wedding cakes involve aesthetic judgments and have decorative elements, the Kleins have not demonstrated that their cakes are inherently "art," like sculptures, paintings, musical compositions, and other works that are both intended to be and are experienced predominantly as expression. Rather, their cakes, even when custom-designed for a ceremonial occasion, *1072 are still cakes made to be eaten. Although the Kleins themselves may place more importance on the communicative aspect of one of their cakes, there is no information in this record that would permit an inference that the same is true in all cases for the *539 Kleins' customers and the people who attend the weddings for which the cakes are created. Moreover, to the extent that the cakes are expressive, they do not reflect only the Kleins' expression. Rather, they are products of a collaborative process in which Melissa's artistic execution is subservient to a customer's wishes and preferences. For those reasons, we do not agree that the Kleins' cakes can be understood to fundamentally and inherently embody the Kleins' expression, for purposes of the First Amendment.[9]
We also reject the Kleins' argument that, under the facts of this case, BOLI's order compels them to "host or accommodate another speaker's message" in a manner that the Supreme Court has deemed to be a violation of the First Amendment. See FAIR , 547 U.S. at 63, 126 S.Ct. 1297 (listing cases). In the only such case that involved the enforcement of a content-neutral public accommodations law, Hurley , the problem was that the speaker's autonomy was affected by the forced intermingling of messages, with consequences for how others would perceive the content of the expression. 515 U.S. at 576-77, 115 S.Ct. 2338 (reasoning that parades, unlike cable operators, are not "understood to be so neutrally presented or selectively viewed," and "the parade's overall message is distilled from the individual presentations along the way, and each unit's expression is perceived by spectators as part of the whole" (emphasis added)). Here, because the Kleins refused to provide their wedding-cake service to Rachel and Laurel altogether, this is not a situation where the Kleins were asked to articulate, host, or accommodate a specific message that they found offensive. It would be a different case if BOLI's order had awarded damages against the Kleins for refusing to decorate a cake with a specific message requested by a customer ("God Bless This Marriage," for example) that they found offensive or contrary to their beliefs. Cf.
*540 Craig v. Masterpiece Cakeshop, Inc. , 370 P.3d 272, 282 n. 8 (Colo. App. 2015), cert. den. , No. 15SC738, 2016 WL 1645027 (Colo. Apr. 25, 2016), cert. granted sub. nom. Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n , --- U.S. ----, 137 S.Ct. 2290, 198 L.Ed.2d 723 (2017) (distinguishing the refusal to create a custom wedding cake for a same-sex couple from the refusal to decorate a cake with a specific message, such as "Homosexuality is a detestable sin. Leviticus 18:2.").
The Kleins' additional concern, as we understand it, is that a wedding cake communicates a "celebratory message" about the wedding for which it is intended, and the Kleins do not wish to "host" the message that same-sex weddings should be celebrated. But, unlike in Hurley , the Kleins have not raised a nonspeculative possibility that anyone attending the wedding will impute that message to the Kleins. We think it more likely that wedding attendees understand that various commercial vendors involved with the event are there for commercial rather than ideological purposes. Moreover, to the extent that the Kleins subjectively feel that they are being "associated" with the idea that same-sex marriage is worthy of celebration, the Kleins are free to engage in their own speech that disclaims such support. Cf. FAIR , 547 U.S. at 65, 126 S.Ct. 1297 (rejecting argument that law schools would be perceived as supporting any speech by recruiters by simply complying with the Solomon Amendment; noting that nothing prevented the schools from expressing their views in other ways).
In short, we disagree that the Kleins' wedding cakes are invariably in the nature of fully protected speech or artistic expression, *1073 and we further disagree that BOLI's order forces the Kleins to host, accommodate, or associate with anyone else's particular message. Thus, because we conclude that BOLI's order does not have the effect of compelling fully protected expression, it does not trigger strict scrutiny under the First Amendment.
As noted above, however, BOLI's order is still arguably subject to intermediate First Amendment scrutiny if the Kleins' cake-making activity involves both expressive and non-expressive elements. O'Brien , 391 U.S. at 376, 88 S.Ct. 1673 ("[W]hen 'speech' and 'nonspeech' elements are combined in the same *541 course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."); see also Turner Broadcasting System, Inc. , 512 U.S. at 661-62, 114 S.Ct. 2445. Here, we acknowledge that the Kleins' cake-making process is not a simple matter of combining ingredients and following a customer's precise specifications. Instead, based on the Kleins' customary practice, the ultimate effect of BOLI's order is to compel them to engage in a collaborative process with a customer and to create a custom product that they would not otherwise make. The Kleins' argument that that process involves individualized aesthetic judgments that are themselves within the realm of First Amendment protected expression is not implausible on its face.
Ultimately, however, we need not resolve whether that argument is correct. That is because, even assuming (without deciding) that the Kleins' cake-making business involves aspects that may be deemed "expressive" for purposes of the First Amendment, BOLI's order is subject, at most, to intermediate scrutiny, and it survives such scrutiny, as explained below.
(4) BOLI's final order survives First Amendment scrutiny
Neither ORS 659A.403 nor BOLI's order is directed toward the expressive content of the Kleins' business. When a content-neutral regulation indirectly imposes a burden on protected expression, it will be sustained if
" 'it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' "
Turner Broadcasting System, Inc. , 512 U.S. at 662, 114 S.Ct. 2445 (quoting O'Brien , 391 U.S. at 377, 88 S.Ct. 1673 ). We address each factor in turn.
We first address the state's interest in enforcing its public-accommodations law. As noted above, the United States Supreme Court has consistently acknowledged that states have a compelling interest both in ensuring equal access to publicly available goods and services and in *542 preventing the dignitary harm that results from discriminatory denials of service. That interest is no less compelling with respect to the provision of services for same-sex weddings; indeed, that interest is particularly acute when the state seeks to prevent the dignitary harms that result from the unequal treatment of same-sex couples who choose to exercise their fundamental right to marry. See Obergefell v. Hodges , --- U.S. ----, 135 S.Ct. 2584, 2600, 192 L. Ed. 2d 609 (2015) ("The right to marry thus dignifies couples who wish to define themselves by their commitment to each other." (Internal quotation marks omitted.)). Thus, we readily conclude that BOLI's order furthers "an important or substantial governmental interest."
Furthermore, Oregon's interest is in no way related to the suppression of free expression. Rather, Oregon has an interest in preventing the harms that result from invidious discrimination that is "wholly apart from the point of view such conduct may transmit." Roberts , 468 U.S. at 628, 104 S.Ct. 3244. BOLI's order reflects a concern with ensuring equal access to products like wedding cakes when a seller chooses to sell them to the general public, not a concern with influencing the expressive choices involved in designing or decorating a cake.
Finally, we conclude that any burden imposed on the Kleins' expression is no greater than essential to further the state's *1074 interest. Again, it is significant that BOLI's order does not compel the Kleins to express an articulable message with which they disagree; rather, their objection is to being compelled to engage in any conduct that they regard as expressive. " '[A]n incidental burden on speech is no greater than is essential, and therefore is permissible' " if " 'the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' " FAIR , 547 U.S. at 67, 126 S.Ct. 1297 (quoting United States v. Albertini , 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L. Ed. 2d 536 (1985) ). Given that the state's interest is to avoid the "evil of unequal treatment, which is the injury to an individual's sense of self-worth and personal integrity," King , 61 Or. App. at 203, 656 P.2d 349, there is no doubt that that interest would be undermined if businesses that market their goods and services to the "public" are given a special privilege to exclude certain *543 groups from the meaning of that word. Thus, we conclude that the final order in this case survives First Amendment scrutiny.
(5) Oregon Constitution, Article I, section 8
The Kleins assert that BOLI's final order also violates their rights under Article I, section 8, of the Oregon Constitution, which provides that "[n]o law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever[.]" The Kleins' argument is limited to the observation that Article I, section 8, has been held to establish broader protection for speech than the First Amendment, a premise from which they conclude that, "since BOLI's Final Order violates the federal Constitution's Speech Clause, it also violates the Oregon Constitution's broader counterpart a fortiori ." We have rejected the First Amendment predicate for that derivative argument, and the Kleins do not offer any separate analysis under the state constitution. Accordingly, we reject their argument under Article I, section 8, without further discussion. See, e.g. , State v. Dawson , 277 Or. App. 187, 189-90, 369 P.3d 1244, rev. den. , 359 Or. 847, 383 P.3d 851 (2016) (declining to consider inadequately developed argument under the state constitution on appeal).
b. Free exercise of religion
We turn to the Kleins' contention that BOLI's order violates their constitutional right to the free exercise of their religion. The Kleins advance two arguments under the United States Constitution: (1) BOLI's final order is not merely the application of a "neutral and generally applicable" law because it impermissibly "targets" religion, and (2) the order implicates the Kleins' "hybrid rights," subjecting it to heightened scrutiny that it cannot survive. The Kleins also invoke the Oregon Constitution's free-exercise clauses in Article I, sections 2 and 3, contending that: (1) as under the federal constitution, the final order impermissibly targets religion, and (2) even if the final order does not impermissibly target religion, they should be granted an exemption to ORS 659A.403 on religious grounds. For the reasons explained below, we reject the Kleins' arguments.
*544 The First Amendment proscribes laws "prohibiting the free exercise of" religion. The question presented by this case is whether BOLI's final order enforcing ORS 659A.403 against the Kleins runs afoul of that constitutional guarantee; if it does, the order is invalid unless it can survive strict scrutiny. See Church of the Lukumi Babalu Aye, Inc. v. Hialeah , 508 U.S. 520, 546-47, 113 S.Ct. 2217, 124 L. Ed. 2d 472 (1993) ; United States v. Lee , 455 U.S. 252, 257-58, 102 S.Ct. 1051, 71 L. Ed. 2d 127 (1982).
The answer begins with Employment Division, Oregon Department of Human Resources v. Smith , in which the United States Supreme Court held that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes ( or proscribes).' " 494 U.S. at 879, 110 S.Ct. 1595 (quoting Lee , 455 U.S. at 263 n. 3, 102 S.Ct. 1051 (Stevens, J., concurring)). Put another way, neutral and generally applicable laws do not offend the Free Exercise Clause simply because "the law has the incidental *1075 effect of burdening a particular religious practice." Church of Lukumi Babalu Aye, Inc. , 508 U.S. at 531, 113 S.Ct. 2217.
To determine whether a law is "neutral," courts first ask whether "the object of [the] law is to infringe upon or restrict practices because of their religious motivation." Id. at 533, 113 S.Ct. 2217. To determine a law's object, we begin with the text, as "the minimum requirement of neutrality is that a law not discriminate on its face." Id. "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context." Id. "Apart from the text, the effect of a law in its real operation is strong evidence of its object." Id. at 535, 113 S.Ct. 2217 ; see id. (cautioning that mere "adverse impact will not always lead to a finding of impermissible targeting"). Additionally, whether a law is "generally applicable" depends on whether the government selectively seeks to advance its interests "only against conduct with a religious motivation." Id. at 543, 113 S.Ct. 2217.
Nothing in the text of ORS 659A.403 or BOLI's final order is facially discriminatory towards the exercise of religious beliefs. Rather, the statute prohibits any "place *545 of public accommodation" from discriminating "on account of" protected characteristics, including "sexual orientation." Similarly, BOLI's order is, on its face, a neutral application of ORS 659A.403 that gives no indication that the result would have been different if the Kleins' refusal of service was based upon secular rather than religious convictions.
A law that is written in neutral terms may still violate the Free Exercise Clause, however. In Church of Lukumi Babalu Aye, Inc. , the Court concluded that the city ordinances in question-which prohibited certain animal slaughtering for "ritual[s]" and "sacrifice"-were not neutral because some important terms, as the ordinances defined them, targeted the Santeria religion's practice of ritualistic animal sacrifice while exempting other secular and religious practices like hunting and kosher slaughter. 508 U.S. at 535-36, 113 S.Ct. 2217. The laws were also not "generally applicable" because they were substantially underinclusive in advancing the government's stated interests of protecting the public health and preventing cruelty to animals. Id. at 543, 113 S.Ct. 2217. Rather, the laws were "drafted with care to forbid few killings but those occasioned by religious sacrifice." Id.
Here, the Kleins advance a similar argument that BOLI's order violates the Free Exercise Clause because it applies ORS 659A.403 in a way that impermissibly "targets" religion for disfavored treatment. They contend that the final order was a "novel expansion" of ORS 659A.403 that "was, at best, discretionary and done for the specific purpose of forcing business owners with moral reservations about same-sex marriage to either violate their consciences or go out of business." (Emphasis removed.) BOLI responds that no evidence exists to support the Kleins' assertions, which are "pure speculation and utterly without merit."
On review of the record, we agree with BOLI. The Kleins have directed us to no evidence whatsoever that ORS 659A.403 was enacted for the purpose of singling out religiously motivated action, or that BOLI has selectively targeted religion in its enforcement of the statute. The Kleins likewise fail to support their assertion that BOLI's final order constitutes a "novel expansion" of the statute, rather than a straightforward application of a facially neutral statute to *546 the facts of this case. For those reasons, the Kleins' "targeting" argument is meritless.
The Kleins' second argument under the federal Free Exercise Clause is that the final order burdens their "hybrid rights." That is, the final order burdens both Free Exercise rights and other constitutional rights, a combination that purportedly triggers an exception to Smith and subjects even neutral laws of general applicability to strict scrutiny. The Kleins' argument relies on the following passage from Smith :
"The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in *1076 conjunction with other constitutional protections, such as freedom of speech ***. ***
"The present case does not present such a hybrid situation, but a free exercise claim unconnected with any communicative activity ***."
494 U.S. at 881-82, 110 S.Ct. 1595.
We have previously expressed skepticism about whether a "hybrid-rights "doctrine" exists, and, to the extent it does, how it could be properly applied. In Church at 295 S. 18th Street, St. Helens , we referred to the Smith passage as "dictum ," observing that it merely "noted-without reference to any particular standard-that, in the past, the Court had struck down neutral, generally applicable laws when a case 'involved' both the Free Exercise Clause and some other constitutional protection." 175 Or. App. at 114, 127-28, 28 P.3d 1185. We questioned whether that dictum could be soundly applied as a legal standard in other cases:
"Why the addition of another constitutional claim would affect the standard of review of a free exercise claim is not immediately obvious. Indeed, if the mere allegation of an additional constitutional claim has the effect of altering the standard articulated in Smith , then the 'hybrid' exception likely would swallow the Smith rule; free exercise claims will frequently also pose at least a colorable free speech claim. On the other hand, if the Court meant that strict scrutiny pertains only when an additional constitutional *547 claim is successfully asserted, then the rule of Smith becomes mere surplusage, as the church already would win under the alternate constitutional theory."
Id. at 127-28, 28 P.3d 1185.
Other courts have similarly called the Smith passage dictum and have declined to follow it. See, e.g. , Combs v. Homer-Ctr. Sch. Dist. , 540 F.3d 231, 247 (3d Cir. 2008) ("Until the Supreme Court provides direction, we believe the hybrid-rights theory to be dicta ."); Watchtower Bible & Tract Soc. of New York, Inc. v. Vill. of Stratton , 240 F.3d 553, 561 (6th Cir. 2001), rev'd on other grounds , 536 U.S. 150, 122 S.Ct. 2080, 153 L. Ed. 2d 205 (2002) ("That language was dicta and therefore not binding."); Knight v. Conn. Dep't of Pub. Health , 275 F.3d 156, 167 (2d Cir. 2001) ("[T]he language relating to hybrid claims is dicta and not binding on this court."). But see Miller v. Reed , 176 F.3d 1202, 1207 (9th Cir. 1999) (applying a "colorable claim" approach, under which strict scrutiny applies if the person asserting a free-exercise claim brings an additional constitutional claim that has a "fair probability or likelihood, but not a certitude, of success on the merits" (internal quotation marks omitted)); accord Axson-Flynn v. Johnson , 356 F.3d 1277, 1295 (10th Cir. 2004).
The intervening years have given us no reason to reconsider our view that the Smith passage was dictum . Despite the considerable doubts about the "hybrid-rights doctrine" that have been expressed in case law and academic commentary,[10] the United States Supreme Court has taken no further steps to embrace such a doctrine. We therefore agree with the Sixth Circuit's reasoning that, "at least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a *548 stricter legal standard than that used in Smith to evaluate generally applicable, exceptionless state regulations under the Free Exercise Clause." Kissinger v. Bd. of Trs. of Ohio State Univ. , 5 F.3d 177, 180 (6th Cir. 1993). Accordingly, we reject the Kleins' "hybrid-rights doctrine" argument.
As noted, the Kleins also invoke Article I, sections 2 and 3, of the Oregon Constitution *1077 (the free-exercise clauses).[11] Under those clauses, when a law is not neutral and expressly targets religion, courts examine the law with "exacting scrutiny"; when the law is "neutral toward religion," the Oregon Supreme Court has framed the proper inquiry as whether there is "statutory authority to make such a regulation" and whether an individual claims "exemption on religious grounds." State v. Hickman/Hickman , 358 Or. 1, 15-16, 358 P.3d 987 (2015) (internal quotation marks omitted) (applying only a "targeting" analysis).
The Kleins' first argument is that the statute and final order are not neutral toward religion because they "target" the Kleins' religious practice. In support of that contention, the Kleins essentially incorporate their arguments under the federal Free Exercise Clause; they do not contend that the analysis meaningfully differs under the state constitution, and we therefore reject that argument for the same reasons discussed above.
Second, the Kleins argue that, even in the absence of impermissible targeting, they should be granted a religious exemption from compliance with ORS 659A.403. They rely on two cases- Hickman and Cooper v. Eugene Sch. Dist. , 301 Or. 358, 723 P.2d 298 (1986). As BOLI correctly points out, however, neither of those cases actually created a religious exemption to a neutral law, or discussed the criteria, methodology, or standards that a court would use in determining whether to grant one. Cooper dealt with a law *549 that was "not neutral toward religion,"[12] which the Supreme Court distinguished from a "general" and "neutral" regulation that could present an issue of an "individual claim to exemption on religious grounds." 301 Or. at 368-69, 723 P.2d 298. Nearly two decades later, Hickman simply cited Cooper , see 358 Or. at 15-16, 358 P.3d 987 in a case that similarly did not present the issue of whether to grant a religious exemption, see id. at 17, 358 P.3d 987 ("The issue before us, then, is not whether and under what circumstances religiously motivated conduct is entitled to an exemption from a generally applicable and neutral law. Nor is the issue before us the more specific one of whether the defendants in this case are entitled to an exemption ***.").
In short, although the Kleins argue that the Oregon Constitution requires that they be granted an exemption on religious grounds to an otherwise neutral law, the cases on which they rely did not impose such a requirement, but merely acknowledged an abstract possibility that it could happen in a future case. The Kleins have not offered a focused argument for why the Oregon Constitution requires an exemption in this case, under the methodology for interpreting our constitution. See, e.g. , Priest v. Pearce , 314 Or. 411, 415-16, 840 P.2d 65 (1992) (identifying "three levels" on which to interpret the Oregon Constitution: its "specific wording, the case law surrounding it, and the historical circumstances that led to its creation"). They simply assert that a religious exemption to ORS 659A.403's requirement of nondiscrimination on account of sexual orientation would impair the state's nondiscrimination goals "minimally, if at all," while furthering goals of "respect and tolerance for people of different beliefs." That argument does not amount to solid constitutional ground in which to root an individual exemption to a valid and neutral statute.
Moreover, it is far from clear that a religious exemption as proposed by the Kleins would have only a "minimal" effect on the state's antidiscrimination objectives. The Kleins seek an exemption based on their sincere religious *550 opposition to same-sex marriage; but those with sincere religious objections *1078 to marriage between people of different races, ethnicities, or faiths could just as readily demand the same exemption. The Kleins do not offer a principled basis for limiting their requested exemption in the manner that they propose, except to argue that there are "decent and honorable" reasons, grounded in religious faith, for opposing same-sex marriage, as recognized by the United States Supreme Court in Obergefell , --- U.S. ----, 135 S.Ct. at 2602. That is not in dispute. But neither the sincerity, nor the religious basis, nor the historical pedigree of a particular belief has been held to give a special license for discrimination. See, e.g ., Bob Jones Univ. v. United States , 461 U.S. 574, 602-03, 103 S.Ct. 2017, 76 L. Ed. 2d 157 (1983) (a religious school's interests in practicing its sincerely held religious beliefs by prohibiting interracial dating and marriage did not outweigh the government's "overriding interest in eradicating racial discrimination in education" (internal quotation marks omitted)).
For the foregoing reasons, we reject the Kleins' arguments that BOLI's final order violates the federal Free Exercise Clause or Article I, sections 2 and 3, of the Oregon Constitution.
B. Second Assignment: Commissioner's Failure to Recuse Himself
In their second assignment of error, the Kleins assert that BOLI's commissioner, Avakian, "the ultimate decision[ ]maker in this case, violated the Kleins' [d]ue [p]rocess rights by failing to recuse himself despite numerous public comments revealing his intent to rule against them." Specifically, they argue that Avakian's comments about the cake controversy in a Facebook post and in an article that appeared in The Oregonian show that he judged the Kleins' case before giving them an opportunity to present their version of the facts and the law. We agree with BOLI that Avakian's comments reflect, at most, his general views about the law and public policy, and therefore are not the kind of comments that require disqualification.
To establish a due-process violation, "[o]ne claiming that a decision [ ]maker is biased has the burden of showing *551 actual bias." Becklin v. Board of Examiners for Engineering , 195 Or. App. 186, 207-08, 97 P.3d 1216 (2004), rev. den. , 338 Or. 16, 107 P.3d 26 (2005) ; see Teledyne Wah Chang v. Energy Fac. Siting Council , 298 Or. 240, 262, 692 P.2d 86 (1984) (same) (citing Boughan v. Board of Engineering Examiners , 46 Or. App. 287, 611 P.2d 670, rev. den. , 289 Or. 588 (1980)). When that claim of bias is based on prejudgment, the relevant inquiry is whether "the decision maker has so prejudged the particular matter as to be incapable of determining its merits on the basis of the evidence and arguments presented." Columbia Riverkeeper v. Clatsop County , 267 Or. App. 578, 602, 341 P.3d 790 (2014).
Importantly, in assessing bias, courts have long distinguished between a decision-maker's prejudgment of facts as opposed to preconceptions about law or policy, particularly in the context of quasi-judicial decisions. See 1000 Friends of Oregon v. Wasco Co. Court , 304 Or. 76, 82-83, 742 P.2d 39 (1987), cert. den. , 486 U.S. 1007, 108 S.Ct. 1733, 100 L.Ed.2d 197 (1988) (explaining that the combination of executive, legislative, and adjudicative functions within a single government body "leaves little room to demand that an elected [official] who actively pursues a particular view of the community's interest in his policymaking role must maintain an appearance of having no such view when the decision is to be made by an adjudicatory procedure"). As we explained in Samuel v. Board of Chiropractic Examiners , 77 Or. App. 53, 60, 712 P.2d 132 (1985), rev. den. , 302 Or. 36, 726 P.2d 935 (1986), "[a] preconceived point of view concerning an issue of law * * * is not an independent basis for disqualification." (Citing, inter alia , Trade Comm'n v. Cement Inst. , 333 U.S. 683, 68 S.Ct. 793, 92 L. Ed. 1010 (1948).). In Cement Inst. , the United States Supreme Court articulated that principle in the context of a challenge to the impartiality of the Federal Trade Commission:
"[No previous] decision of this Court would require us to hold that it would be a violation of procedural due process for a judge to sit in a case after he had expressed an opinion as to whether certain types of conduct were prohibited by law.
*1079 In fact, judges frequently try the same case more than once and decide identical issues each time, although these issues involved questions both of law and fact. Certainly, the Federal Trade Commission cannot possibly be under *552 stronger constitutional compulsions in this respect than a court."
333 U.S. at 702-03, 68 S.Ct. 793 (footnote omitted); accord Rombough v. Fed. Aviation Admin. , 594 F.2d 893, 900 (2d Cir. 1979) ("[I]t is not improper for members of regulatory commissions to form views about law and policy on the basis of their prior adjudications of similar issues which may influence them in deciding later cases. An agency's conclusions as to general principles of law do not require disqualification." (Citing, inter alia , Cement Inst. , 333 U.S. at 700-03, 68 S.Ct. 793 ; citations omitted.).).
Accordingly, public comments that convey preconceptions about law or policy related to a dispute do not automatically disqualify a decision-maker from judging that controversy. As Judge Jerome Frank succinctly observed in In re J.P. Linahan, Inc. , 138 F.2d 650, 651 (2d Cir. 1943), if " 'bias' and 'partiality' be defined to mean the total absence of preconceptions in the mind of the judge, then no one has ever had a fair trial and no one ever will." The touchstone of bias, instead, is whether the comments show that the decision maker is not capable of judging the controversy fairly on its own facts. See Hortonville Dist. v. Hortonville Educ. Ass'n , 426 U.S. 482, 493, 96 S.Ct. 2308, 49 L. Ed. 2d 1 (1976) ("Nor is a decision[ ]maker disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.' " (Quoting United States v. Morgan , 313 U.S. 409, 421, 61 S.Ct. 999, 85 L. Ed. 1429 (1941), and citing Cement Institute , 333 U.S. at 701, 68 S.Ct. 793.)).
In assessing a decision-maker's capability in that regard, we presume that public officials will perform their duties lawfully. Gilmore v. Board of Psychologist Examiners , 81 Or. App. 321, 324, 725 P.2d 400, rev. den. , 302 Or. 460, 730 P.2d 1250 (1986) (citing ORS 40.135(1)(j) ); see Morgan , 313 U.S. at 421, 61 S.Ct. 999 ("Cabinet officers charged by Congress with adjudicatory functions are not assumed to be flabby creatures any more than judges are. Both may have an underlying philosophy in approaching a specific case. But both are assumed to be men of conscience and intellectual discipline, capable of *553 judging a particular controversy fairly on the basis of its own circumstances.").
In this case, Avakian's comments on Facebook and in the The Oregonian fall short of the kinds of statements that reflect prejudgment of the facts or an impermissibly closed-minded view of law or policy so as to indicate that he, as a decision maker, cannot be impartial. On Facebook, before a BOLI complaint had been filed, Avakian posted:
"Everyone has a right to their religious beliefs, but that doesn't mean they can disobey laws that are already in place. Having one set of rules for everybody ensures that people are treated fairly as they go about their daily lives."
Below that paragraph, Avakian provided a link to " 'Ace of Cakes' [13 ] offers free wedding cake for Ore. Gay couple www.kgw.com.," followed by another paragraph:
"The Oregon Department of Justice is looking into a complaint that a Gresham bakery refused to make a wedding cake for a same sex marriage. *** It started when a mother and daughter showed up at Sweet Cakes by Melissa looking for a wedding cake."
Viewed in context with the rest of the post, Avakian's statements that "[e]veryone has a right to their religious beliefs, but that doesn't mean they can disobey laws that are already in place," and that "[h]aving one set of rules for everybody ensures that people are treated fairly as they go about their daily lives," are comments about the controversy between the Kleins and the complainants. However, they do not describe particular *1080 facts of the case, suggest that Avakian has already investigated or decided those facts, or even suggest that he has fixed views as to any defenses or interpretations of the law that might be advanced in the context of a contested proceeding. That is, they reflect his general views of law and policy regarding public accommodations laws, but not the type of prejudgment that casts doubt on whether he is capable of judging the controversy fairly in an official proceeding.
Avakian's statements in The Oregonian article likewise fail to demonstrate that he was incapable of fairly *554 judging this case. As BOLI points out, the Kleins selectively quote from that article to create an impression that Avakian was commenting specifically on their conduct. For instance, in quoting excerpts, the Kleins argue that Avakian "said that 'folks' in Oregon do not have a 'right to discriminate' and stated that those who use their 'beliefs' to justify discrimination need to be 'rehabilitate[d].' " (Alterations by the Kleins.) Later, the Kleins characterize Avakian as stating that "the Kleins *** needed to be 'rehabilitate[d].' "
The full quotations from that article, viewed in context, present a different picture. The article states, " 'Everybody is entitled to their own beliefs, but that doesn't mean that folks have the right to discriminate,' Avakian said, speaking generally ." (Emphasis added.) That sentence follows a paragraph in which the author describes the antidiscrimination law generally. Given that context, and the author's express qualification that Avakian was "speaking generally," there is no basis on which to conclude that Avakian was commenting specifically on the merits of the Kleins' case.
Similarly, and contrary to the Kleins' suggestion, the article does not quote Avakian as saying that the Kleins must be "rehabilitated." Rather, the article quotes Avakian concerning a more general proposition: " 'The goal is never to shut down a business. The goal is to rehabilitate,' Avakian said. 'For those who do violate the law, we want them to learn from that experience and have a good, successful business in Oregon.' " Again, nothing in that quote suggests that Avakian was responding to a question about the Kleins in particular, as opposed to BOLI investigations in general. Indeed, the context again suggests the latter. The next sentence in the article states, "The bureau's civil rights division conducts about 2,200 investigations a year on all types of discrimination, Avakian said."
There is, in fact, only one quote attributed to Avakian in The Oregonian article that appears to relate specifically to the Kleins' case-one that they do not mention. With regard to BOLI's investigation of the complaint against the Kleins, Avakian is quoted as saying, " 'We are committed *555 to a fair and thorough investigation to determine whether there's substantial evidence of unlawful discrimination.' "
In sum, the public comments on which the Kleins rely do not demonstrate anything more than Avakian's general views about law and policy related to antidiscrimination statutes.[14] Because those types of public comments do not establish a lack of impartiality for purposes of due process, we reject the Kleins' second assignment of error.
C. Third Assignment: Damages Award
In their third assignment of error, the Kleins argue that BOLI's damages award of $75,000 and $60,000 to Rachel and Laurel, respectively, is not supported by substantial evidence or substantial reason. See ORS 183.482 (8)(c) ("The court shall set aside or remand the order if the court finds that the order is not supported by substantial evidence in the record."); Hamilton v. Pacific Skyline, Inc. , 266 Or. App. 676, 680, 338 P.3d 791 (2014) (explaining that the "substantial reason requirement inheres in our substantial evidence standard of review under ORS 183.482(8)(c)"). Within the assignment of error, they make three distinct contentions: (1) the damages award is inconsistent with BOLI's findings and ignores the Kleins' mitigating *1081 evidence and evidence of the complainants' discovery abuses; (2) the damages award is "internally contradictory" with regard to recovery for emotional distress resulting from publicity of the case; and (3) the damages award is out of line with BOLI's awards in other cases. As discussed below, we reject each of those challenges.
To better frame the arguments, we provide additional context for the damages award. Under ORS 659A.850(4)(a)(B), BOLI is authorized to "[e]liminate the effects of the unlawful practice that the respondent is found to have engaged in, including but not limited to paying an award of actual damages suffered by the complainant and complying with injunctive or other equitable relief[.]" In this case, *556 BOLI's formal charges alleged that, pursuant to that statute, each complainant claimed "[d]amages for emotional, mental, and physical suffering in the amount of at least $75,000."
At the hearing on damages, BOLI offered evidence of the emotional distress that the complainants suffered as a result of the Kleins' denial of service, including testimony from Rachel and Laurel. The Kleins offered evidence to rebut BOLI's evidence that the refusal of service was the source of the complainants' distress, including evidence that, during the relevant time period, the complainants were engaged in a custody dispute for their two foster children. They also elicited testimony from Rachel's brother to support their theory that the complainants were pursuing the case for political reasons rather than to remedy emotional distress.
During closing arguments, BOLI's prosecutor explained that the agency was seeking damages related to two different causes:
"There are two distinct causes of emotional distress damages in this case. The first is the damage that's based on the refusal itself, and for that the Agency is seeking $75,000 for each Complainant. There is also the damages that resulted from the media scrutiny of this case, and for that amount we would defer to the forum's discretion."
BOLI's prosecutor then proceeded to argue the two causes separately, first recounting testimony about the feelings of embarrassment, depression, sadness, and anger that Rachel and Laurel experienced around the time of the refusal and thereafter, including the strain that it put on their relationship and their relationships with others. The prosecutor then argued that "[t]he second cause of emotional distress is this media scrutiny." She contended that the media coverage had made Rachel and Laurel fearful for their lives, afraid for the safety of their foster children, and anxious that it would jeopardize their then-pending efforts to adopt the children.
Anticipating a challenge to the amount of the damages sought, BOLI's prosecutor argued that emotional distress damages are "very fact specific," and that "$75,000 for the refusal itself is very well within the parameters of what's appropriate." (Emphasis added.)
*557 The Kleins responded that the complainants had not told a consistent story throughout; that there was no credible evidence that the emotional distress suffered by the complainants was actually caused by the denial of service as opposed to other factors in the complainants' lives, such as the custody dispute; that neither Rachel nor Laurel was present for Aaron's "abomination" statement when Cheryl returned to the shop and that, in any event, there was disagreement as to what he actually said; and that the previous cases referenced by BOLI's prosecutor involved more severe instances of discriminatory treatment.
In rebuttal, BOLI's prosecutor emphasized that whether Aaron called the complainants "an abomination" or quoted a Bible verse using that word was "beside the point": "[H]ow it was couched doesn't really matter; the word is what resonated with the Complainants."
In his proposed final order, the ALJ set forth extensive factual findings, including express credibility determinations regarding the witnesses at the hearing. The ALJ found that Rachel, despite being an "extremely emotional witness," had "answered questions directly in a forthright manner" and "did not try to minimize the effect of media exposure on her emotional state as compared to how *1082 the cake denial affected her." The ALJ explained that it credited Rachel's testimony "about her emotional suffering in its entirety," but that he "only credited her testimony about media exposure when she testified about specific incidents." *558 The ALJ found Laurel less credible. That was because Laurel "was a very bitter and angry witness who had a strong tendency to exaggerate and over-dramatize events," argued with the Kleins' attorney and "had to be counseled by the ALJ to answer the questions asked of her instead of editorializing about the cake refusal and how it affected her," and her "testimony was inconsistent in several respects with more credible evidence." Thus, the ALJ "only credited her testimony about media exposure when she testified about specific incidents" and otherwise credited her testimony only "when it was either (a) undisputed, or (b) disputed but corroborated by other credible testimony."
The ALJ then set forth his reasoning regarding a damages award, describing specific aspects of each complainant's emotional suffering and distinguished "suffering from the cake refusal" from "suffering from publicity about the case." With regard to the latter, the ALJ ultimately concluded that, as a factual matter, the Kleins were "responsible" for at least some of the publicity that had followed the initial refusal, but that "there is no basis in law for awarding damages to Complainants for their emotional suffering caused by media and social media attention related to this case."
The ALJ's proposed final order then set forth his conclusion on the amount of damages related to the initial refusal:
"In this case, the forum concludes that $75,000 and $60,000, are appropriate awards to compensate Complainants [Rachel] and [Laurel], respectively, for the emotional suffering they experienced from Respondents' cake refusal. [Laurel] is awarded the lesser amount because she was not present at the cake refusal and the forum found her testimony about the extent and severity of her emotional suffering to be exaggerated in some respects."
BOLI, in its final order, largely adopted the reasoning and conclusions proposed by the ALJ, including his credibility determinations. BOLI, like the ALJ, separately discussed the emotional suffering of each complainant with regard to the denial of service and from publicity. And, like the ALJ, BOLI concluded that damages for emotional suffering caused by media attention were not recoverable.
BOLI's final order also adopted the ALJ's analysis of the amount of damages to each complainant. The order states:
"In this case, the ALJ proposed that $75,000 and $60,000, are appropriate awards to compensate [Rachel and Laurel], respectively, for the emotional suffering they experienced from Respondents' denial of service. The proposal for [Laurel] is less because she was not present at the denial and the ALJ found her testimony about the extent and severity of her emotional suffering to be exaggerated in some respects. In this particular case, the demeanor of the witnesses was critical in determining both the sincerity *559 and extent of the harm that was felt by [Rachel and Laurel]. As such, the Commissioner defers to the ALJ's perception of the witnesses and evidence presented at hearing and adopts the noneconomic award as proposed, finding also that this noneconomic award is consistent with the forum's prior orders."
In a footnote to that paragraph, the order cites specific BOLI cases in which damages were awarded, in amounts ranging from $50,000 to $350,000 per complainant.
With that background, we return to the issues presented by the Kleins' third assignment of error.
1. Countervailing evidence
The Kleins assert that BOLI's order "is inconsistent with its credibility determinations"-specifically, BOLI's findings regarding what Aaron actually said to Cheryl when she returned to Sweetcakes after the initial refusal of service. According to the Kleins, BOLI found as fact that Aaron did not actually refer to Rachel as an "abomination" but had only quoted a verse from the Book of Leviticus, stating, "You shall not lie with a *1083 male as one lies with a female; it is an abomination." Yet, BOLI awarded damages to both complainants "for harm attributable to being called 'abomination[s].' "
We do not read BOLI's order to rest on a finding that Aaron specifically called the complainants "an abomination" as opposed to quoting a biblical verse. As described above, BOLI argued during the damages hearing that exactly how the word was "couched" was beside the point. BOLI's final order likewise reflects a focus on the effect of the word "abomination" on the complainants, including their recognition of that biblical reference and their associations with the reference. For instance, the order states that Rachel, who was brought up as a Southern Baptist, "interpreted [Aaron's] use of the word 'abomination' [to] mean that God made a mistake when he made her, that she wasn't supposed to exist, and that she had no right to love or be loved [.]" Similarly, the order states that Laurel recognized the statement as a reference from Leviticus and, based on her religious background, "understood the term 'abomination' to mean 'this is a creature not created *560 by God, not created with a soul. They are unworthy of holy love. They are not worthy of life.' "
Viewing the final order as a whole, we see no inconsistency. BOLI found that Aaron used the term "abomination" in the course of explaining why he was denying service to the complainants on account of their sexual orientation, and further found that the complainants experienced emotional distress based on the use of that term. It is that nexus that underlies BOLI's damages award.
The Kleins also argue that the final order does not account for certain evidence that undermined the damages case, including evidence that the complainants were pursuing the case out of a desire for political change and that they were experiencing stress from their custody dispute at the time. The Kleins also argue that the final order fails to account for ways in which the complainants frustrated the Kleins efforts to "discover the true extent of their alleged emotional harm." According to the Kleins, the final order therefore lacks substantial reason.
The Kleins' argument in that regard "misconceives the nature of the substantial reason requirement." Jenkins v. Board of Parole , 356 Or. 186, 208, 335 P.3d 828 (2014). As the Supreme Court explained in Jenkins , an order satisfies the substantial reason requirement so long as it "provide[s] an explanation connecting the facts of the case and the result reached, and [there is] no indication that, in making its decision, the [agency] relied on evidence that did not qualify as substantial evidence." Id. Beyond that, an agency generally is not required to explain why it was not persuaded by particular evidence. See D. T. v. Dept. of Human Services , 247 Or. App. 293, 304 n. 5, 269 P.3d 96 (2011) ("The 'substantial reason' test does not require an agency to expressly reject each of a petitioner's arguments or recount all the evidence that the agency considered; rather, it requires that an agency adequately explain 'the reasoning that leads * * * from the facts that it has found to the conclusions that it draws from those facts.' " (Quoting Drew v. PSRB , 322 Or. 491, 500, 909 P.2d 1211 (1996) ; emphases removed.)); Kaiser Permanente v. Bonfiglio , 241 Or. App. 287, 291, 249 P.3d 158, rev. den. , 350 Or. 573, 258 P.3d 1239 (2011) ("[T]he board relied primarily *561 on Stigler's opinion, and adequately explained why it found his opinion to be the most persuasive. The board was not required to explain why all the other opinions were less persuasive. Stigler's opinion constitutes substantial evidence and supports the board's findings."); see also Jenkins , 356 Or. at 200 n. 6, 335 P.3d 828 ("Nothing in [a previous decision, Gordon v. Board of Parole , 343 Or. 618, 175 P.3d 461 (2007),] suggests that, for purposes of substantial reason review under ORS 183.482(8)(c), the court believed that the board was required to identify specific evidence in the record that supported its ultimate determinations of fact and law.").
In this case, BOLI's order includes extensive factual findings regarding the emotional suffering that the complainants experienced and it connects the amount of damages to that suffering. That is sufficient to satisfy the substantial reason requirement, and we decline to reweigh, under the guise of substantial *1084 reason, the competing evidence as to the extent of the complainants' damages. See Multnomah County Sheriff's Office v. Edwards , 277 Or. App. 540, 562, 373 P.3d 1099 (2016), aff'd , 361 Or. 761, 399 P.3d 969 (2017) (explaining that "the amount of damages that a complainant is entitled to is an issue of fact," which we review for substantial evidence).
2. Damages from publicity and media attention
Next, the Kleins argue that the damages award is internally inconsistent in its treatment of harm caused by media attention from the case. According to the Kleins, BOLI's formal charges "sought $150,000 in total damages based on alleged emotional suffering stemming from the denial of service and subsequent media exposure." (Emphases by the Kleins.) But then, despite concluding that the complainants were not entitled to recover for harm attributable to media exposure, the final order awards an amount close to the prayer.
The Kleins' argument proceeds from a mistaken premise. BOLI's formal charges did not seek "$150,000 in total damages based on alleged emotional suffering stemming from the denial of service and subsequent media exposure." (Emphases by the Kleins.) Rather, the formal charges sought damages in "the amount of at least $75,000 " for each *562 complainant. (Emphasis added.) And, as described above, BOLI's prosecutor clearly expressed during the damages hearing-and the ALJ plainly understood-that BOLI was seeking $75,000 for each complainant for the refusal itself and additional damages, at the ALJ's discretion, for harm attributable to media and social media attention. Both the ALJ's preliminary order and BOLI's final order reflect that understanding of the damages request.[15] Thus, there is no plausible basis on which to infer that, by awarding $75,000 to Rachel and $60,000 to Laurel, BOLI relied to any extent on emotional suffering from media attention, particularly when BOLI's order expressly says otherwise.
The Kleins' alternative contention regarding publicity damages is based on a statement that BOLI made in the context of denying recovery for those damages. In that part of the order, BOLI concluded that "complainants' emotional harm related to the denial of service continued throughout the period of media attention and that the facts related solely to emotional harm resulting from media attention do not adequately support an award of damages." (Emphases added.) According to the Kleins, that emphasized text reflects that BOLI "awarded damages for harm lasting over twenty-six months" related solely to the initial denial of service, yet the proposed final order and final order "note a near total lack of any such evidence" regarding persistent harm from the initial refusal.
The Kleins' mischaracterize the relevant orders. In his proposed final order, the ALJ distinguished testimony about specific incidents involving emotional suffering from testimony about emotional suffering more generally. The *563 ALJ credited Laurel's testimony that she "still feels emotional effects from the denial of service because [Rachel and their two children] 'were' still suffering and that 'was' tearing me apart." The ALJ also specifically found that Rachel had not tried "to minimize the effect of media exposure on her emotional state as compared to how the cake denial affected her," and he credited Rachel's testimony "about her emotional suffering in its entirety." His order further states:
"Without giving any specific examples, [Rachel] credibly testified that, in a gener *1085 al sense, the cake refusal has caused her continued emotional suffering up to the time of hearing . Other than that, she did not testify as to any specific suffering she experienced after February 1 that was directly attributable to the cake refusal."
(Emphasis added; footnote omitted.)
In adopting the ALJ's reasoning, BOLI's final order similarly distinguished between generalized testimony and testimony about specific instances of suffering, and it repeated the ALJ's findings in that regard.
Viewed in context, BOLI's findings and conclusions demonstrate that it credited Laurel's and Rachel's testimony that, at the time of the hearing, they continued to experience some degree of emotional suffering from the initial refusal, but the final order also reflects that BOLI understood that evidence to be generalized and limited. Nothing in the final order indicates that BOLI gave that evidence more weight than it could bear, or suggests that the agency relied on evidence that was not substantial when determining damages. Rather, the complainants' generalized evidence of continued suffering until the time of the hearing is one among the many facts on which the agency relied to support the damages award in the final order. See Edwards , 277 Or. App. at 563, 373 P.3d 1099 ("[A] complainant's testimony, if believed, is sufficient to support a claim for emotional distress damages."); id. (citing Peery v. Hanley , 135 Or. App. 162, 165, 897 P.2d 1189, adh'd to on recons , 136 Or. App. 492, 902 P.2d 602 (1995), for the proposition that a "plaintiff's testimony, if believed, is sufficient to establish [the] causation element of [an] emotional distress claim").
*564 3. Consistency with other BOLI awards
Finally, the Kleins argue that BOLI's award lacks substantial reason because it is "out of line with comparable cases." The Kleins contend, as they did below, that the complainants' suffering relates to a single, discrete incident, whereas past BOLI cases with such significant damages awards involved ongoing harassment and typically involved emotional suffering so severe that it required medical treatment.
Fact-matching, when considering emotional distress damages, is of limited value. As we explained in Edwards , BOLI must consider "the type of discriminatory conduct, and the duration, frequency, and severity of the conduct. It also considers the type and duration of the mental distress and the vulnerability of the [c]omplainant." 277 Or. App. at 563, 373 P.3d 1099 (internal quotation marks omitted; alteration in original). The actual amount of any award, therefore, depends on the facts presented by each complainant. Id.
As BOLI notes in its final order, the agency has awarded far greater damages than $75,000 and $60,000 to a complainant in cases involving invidious discrimination. E.g. , In the Matter of Andrew W. Engel, DMD , 32 BOLI 94, 114, 140-41 (2012) (awarding $325,000 in damages for "emotional, mental, and physical suffering" to a complainant subjected to harassment for religious beliefs, which resulted in anxiety, stress, insomnia, gastrointestinal problems and weight loss requiring medical treatment); In the Matter of From the Wilderness, Inc. , 30 BOLI 227, 284-85, 292-93 (2009) (awarding $125,000 in damages for "mental and emotional suffering" to a complainant subjected to verbal and physical sexual harassment for more than two months before being fired and then retaliated against, and who then suffered panic attacks requiring medical treatment). BOLI has also awarded lesser amounts in cases involving significant trauma, e.g. , In the Matter of Charles Edward Minor , 31 BOLI 88, 99, 104-05 (2010) (awarding $50,000 in damages for "emotional, mental, and physical suffering" to a complainant subjected to verbal and physical sexual harassment, with the abuse culminating in the respondent striking her in the head with his fist, and the abuse caused anxiety, *565 reclusiveness, and fear). Nonetheless, given BOLI's detailed factual findings about the effect of the refusal of service on these particular complainants-including anger, depression, questioning their own identity and self-worth, embarrassment, shame, frustration, along with anxiety and reduced excitement about the wedding itself-we cannot say that the order is so far out of line with previous cases that it lacks substantial reason. See Edwards , 277 Or. App. at 542-43, 564-65, 373 P.3d 1099 (reaching *1086 a similar conclusion with regard to BOLI's $50,000 emotional-distress award to a complainant who had not received the veterans' preference during a hiring process, and the complainant experienced physical symptoms of stress, was "upset," "felt that he was not receiving the respect to which he was entitled," and his "relationships suffered"; and observing that the award "was comparable to the awards given in [one previous BOLI case] and significantly less than the award given in [another case] to a complainant who suffered similar symptoms of emotional distress").
For the foregoing reasons, we reject the third assignment of error and affirm the damages award.
D. Fourth Assignment: Application of ORS 659A.409
In their fourth assignment of error, the Kleins contend that BOLI erred in concluding that they violated ORS 659A.409. That statute provides, as pertinent here, that
"it is an unlawful practice for any person acting on behalf of any place of public accommodation as defined in ORS 659A.400 to publish, circulate, issue or display, or cause to be published, circulated, issue or displayed, any communication, notice, advertisement or sign of any kind to the effect that any of the accommodations, advantages, facilities, services or privileges of the place of public accommodation will be refused, withheld from or denied to, or that any discrimination will be made against, any person on account of race, color, religion, sex, sexual orientation, national origin, marital status or age ***."
ORS 659A.409. In essence, the statute makes it unlawful to threaten to commit unlawful discrimination. In its final order, BOLI concluded that the Kleins did so through several statements, as discussed below, and enjoined them from committing further violations.
*566 The Kleins acknowledge that BOLI "may enjoin people from threatening to discriminate on the basis of sexual orientation," without implicating the First Amendment. Cf. FAIR , 547 U.S. at 62, 126 S.Ct. 1297 (observing that Congress may, for example, require employers to "take down a sign reading 'White Applicants Only' "). However, the Kleins argue that the statements that BOLI found objectionable did not communicate any intention to discriminate in the future, but merely expressed the Kleins' views about the ongoing controversy and their belief in the validity of their legal and moral position.
The final order describes three discrete statements attributed to the Kleins. First, in the February 2014 interview with Tony Perkins, Aaron described his brief conversation with Rachel at Sweetcakes that led to him telling her, "[W]e don't do same-sex marriage, same-sex wedding cakes." Second, at a different point in that same interview, Aaron related an earlier conversation that he had had with Melissa regarding the prospect of legalized same-sex marriage; in that conversation, according to Aaron, he and Melissa agreed that they could "see it is going to become an issue but we have to stand firm." Third, BOLI relied on the handwritten sign that was taped to the inside of Sweetcakes' front window, which read, in part, "Closed but still in business. * * * This fight is not over. We will continue to stand strong. Your religious freedom is becoming not free anymore. This is ridiculous that we cannot practice our faith. The LORD is good and we will continue to serve HIM with all our heart."
In the final order, BOLI reasoned that the above statements, considered in "text and context," were properly construed as "the recounting of past events," but also "constitute notice that discrimination will be made in the future by refusing such services." As a result, BOLI's final order included language ordering the Kleins "to cease and desist" from making any communication "to the effect that" they would discriminate in the future "on account of sexual orientation." The language in the order precisely tracks the statutory language in ORS 659A.409, quoted above.
On judicial review, the Kleins essentially make two arguments. First, they argue that BOLI erred in concluding *567 that the three statements, individually or collectively, violated ORS 659A.409 by communicating an intention to discriminate in the future. In the Kleins' view, those statements simply describe *1087 "the facts of this case, their view of the law, and their intent to vindicate that view." Second, the Kleins argue that BOLI's injunction is overbroad to the extent that it purports to restrict the Kleins from expressing those views.
We agree with the Kleins' first point. Aaron's statements in the February 2014 interview can be reasonably understood only one way: as describing past events. BOLI's order states that Aaron "did not say only that he would not do complainants' specific marriage and cake but, that respondents 'don't do' same-sex marriage and cakes." But regardless of whether his words can be understood to refer generally to same-sex marriage and cakes, BOLI ignores the context in which he made that remark during the interview. Aaron was asked by the interviewer, "Tell us how this unfolded and your reaction to that." He responded by describing what had happened on the day of the refusal , including, "I said , 'I'm very sorry, I feel like you may have wasted your time. You know we don't do same-sex marriage, same-sex wedding cakes.' And she got upset, noticeably, and I understand that." (Emphasis added.) Viewed in that context, Aaron's recounting of those historical events cannot be understood as a statement that he would deny service in the future.
Likewise, Aaron's recounting, during the interview, of past conversations that he and Melissa had engaged in before the denial of service cannot reasonably be understood as an assertion of their plans to discriminate in the future. Aaron was asked by the interviewer whether the controversy with the complainants had caught him off guard, and he responded, "[I]t was one of those situations where we said 'well I can see it is going to become an issue but we have to stand firm.' " That statement plainly recounted his past thinking and cannot reasonably be construed as the kind of threat of prospective discrimination that ORS 659A.409 prohibits.
That leaves the note taped to the Sweetcakes window. Again, that note read:
*568 "Closed but still in business. You can reach me by email or facebook. www.sweetcakesweb.com or Sweetcakes by Melissa facebook page. New phone number will be provided on my website and facebook. This fight is not over. We will continue to stand strong. Your religious freedom is becoming not free anymore. This is ridiculous that we cannot practice our faith. The LORD is good and we will continue to serve HIM with all our heart [heart symbol]."
(Uppercase and underscoring in original; spacing altered.) BOLI concedes that the statement could refer to their intention to stand strong in their legal fight, but argues that it "also could refer to the denial of services to same-sex couples."
We are not persuaded that, given the ambiguity in the note, it can serve as an independent basis for BOLI's determination that the Kleins violated ORS 659A.409 -and, indeed, BOLI did not purport to rely on the note alone. As explained above, in overturning the ALJ's determination regarding ORS 659A.409, BOLI relied heavily on statements in the Perkins interview-taken out of context-to conclude that the Kleins had communicated an intention to discriminate in the future. When those statements and the note are viewed in their proper context, the record does not support BOLI's conclusion that the Kleins violated ORS 659A.409. We therefore reverse that part of BOLI's order.[16]
Reversed as to BOLI's conclusion that the Kleins violated ORS 659A.409 and the related grant of injunctive relief; otherwise affirmed.

Because the Kleins do not challenge BOLI's findings of historical fact, we take those facts-as described here and within particular assignments of error-from the findings set forth in BOLI's final order. Meltebeke v. Bureau of Labor and Industries , 322 Or. 132, 134, 903 P.2d 351 (1995), abrogated on other grounds by State v. Hickman/Hickman, 358 Or. 1, 24, 358 P.3d 987 (2015) (unchallenged factual findings are the facts for purposes of judicial review of an administrative agency's final order).

Because multiple parties and witnesses share the same last names, we at times use first names throughout this opinion for clarity and readability.

The formal charges had alleged that Melissa and Aaron each violated ORS 659A.403, and that Aaron had aided and abetted Melissa's violation. See ORS 659A.406 (making it an unlawful practice for any person to aid or abet unlawful discrimination by any place of public accommodation). The ALJ granted the Kleins' motion for summary judgment on the allegations that Melissa had violated ORS 659A.403, and on the allegations that Aaron had aided and abetted her in violation of ORS 659A.406. However, the ALJ, and later BOLI, concluded that the Kleins were jointly and severally liable for Aaron's violation of ORS 659A.403, and the parties have not distinguished between Aaron's and Melissa's liability for purposes of judicial review. For readability, we likewise discuss the Kleins' liability jointly and do not further discuss theories of aiding and abetting, which are not at issue before us.

On judicial review, the Kleins do not dispute that Sweetcakes is a "place of public accommodation" within the meaning of ORS 659A.403. See ORS 659A.400 (defining "a place of public accommodation" for purposes of ORS chapter 659A).

At the time that the Oregon Family Fairness Act was enacted, Article XV, section 5a, of the Oregon Constitution defined "marriage" to be limited to the union of one man and one woman, and the Oregon Family Fairness Act expressly states that it "cannot bestow the status of marriage on partners in a domestic partnership." Or. Laws 2007, ch. 99, § 2(7). Nonetheless, the act contemplated, but did not require, the performance of "solemnization ceremony[ies]" and left it to the "dictates and conscience of partners entering into a domestic partnership to determine whether to seek a ceremony or blessing over the domestic partnership." Or. Laws 2007, ch. 99, § 2(8). Thus, the legislature was aware that same-sex couples would be participating in wedding ceremonies, and when it simultaneously chose to extend the protections of ORS 659A.403 to cover sexual orientation, there is no reason to believe that it intended to exempt places of public accommodation-such as cake shops, dress shops, or flower shops-so as to permit them to discriminate with regard to services related to those anticipated ceremonies.

In doing so, we join other courts that have declined to draw a "status/ conduct" distinction similar to that urged by the Kleins. See, e.g. , State v. Arlene's Flowers, Inc. , 187 Wash. 2d 804, 823, 389 P.3d 543, 552 (2017) (stating that "numerous courts-including our own-have rejected this kind of status/conduct distinction in cases involving statutory and constitutional claims of discrimination," and citing cases to that effect).

The issue is currently before the Supreme Court in a case involving a Colorado bakery that similarly refused to make a wedding cake for a same-sex couple. Craig v. Masterpiece Cakeshop, Inc. , 370 P.3d 272 (Colo. App. 2015), cert. den. , No. 15SC738, 2016 WL 1645027 (Colo. Apr. 25, 2016), cert. granted sub. nom. Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n , --- U.S. ----, 137 S.Ct. 2290, 198 L.Ed.2d 723 (2017).

The First Amendment's protection of artwork is distinct from the protections that extend to so-called "expressive conduct." Expressive conduct involves conduct that may be undertaken for any number of reasons but, in the relevant instance, is undertaken for the specific purpose of conveying a message. See, e.g. , Texas v. Johnson , 491 U.S. 397, 405, 109 S.Ct. 2533, 105 L. Ed. 2d 342 (1989) (reasoning that not every action taken with respect to the flag of the United States is necessarily expressive); United States v. O'Brien , 391 U.S. 367, 375, 88 S.Ct. 1673, 20 L. Ed. 2d 672 (1968) (recognizing that a person may knowingly destroy a draft card without necessarily intending to express any particular view). For example, a person may camp in a public park for any number of reasons, only some of which are intended to express an idea. See Clark v. Community for Creative Non-Violence , 468 U.S. 288, 104 S.Ct. 3065, 82 L. Ed. 2d 221 (1984). In contrast (as we understand the Supreme Court to have held), because the creation of artwork and other inherently expressive acts are unquestionably undertaken for an expressive purpose, they need not express an articulable message to enjoy First Amendment protection.

To be clear, we do not foreclose the possibility that, on a different factual record, a baker (or chef) could make a showing that a particular cake (or other food) would be objectively experienced predominantly as art-especially when created at the baker's or chef's own initiative and for her own purposes. But, as we have already explained, the Kleins never reached the point of discussing what a particular cake for Rachel and Laurel would look like; they refused to make any wedding cake for the couple. Therefore, in order to prevail, the Kleins (as they implicitly acknowledge) must demonstrate that any cake that they make through their customary practice constitutes their own speech or art. They have not done so.

See, e.g. , Church of Lukumi Babalu Aye, Inc. , 508 U.S. at 567, 113 S.Ct. 2217 (Souter, J., concurring) (dismissing the doctrine as "ultimately untenable"); Kissinger v. Bd. of Trs. of the Ohio State Univ. , 5 F.3d 177, 180 (6th Cir. 1993) (calling the "hybrid-rights doctrine" "completely illogical"); Erwin Chemerinsky, Constitutional Law: Principles and Policies § 12.3.2.3 at 1261-62 (3d ed. 2006) (describing the doctrine's status as unclear); Michael W. McConnell, Free Exercise Revisionism and the Smith Decision , 57 U Chi. L. Rev. 1109, 1122 (1990) ( "[A] legal realist would tell us * * * that the Smith Court's notion of 'hybrid' claims was not intended to be taken seriously.").

Article I, sections 2 and 3, provide:
"Section 2. Freedom of worship. All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences.
"Section 3. Freedom of religious opinion . No law shall in any case whatever control the free exercise, and enjoyment of religeous [sic ] opinions, or interfere with the rights of conscience."

Former ORS 342.650 (1965), repealed by Or. Laws 2010, ch. 105, § 3 (spec. sess.), provided:
"No teacher in any public school shall wear any religious dress while engaged in the performance of his duties as a teacher."

"Ace of Cakes" refers to a television show, the host of which provided the complainants with a free wedding cake.

The Kleins' opening brief appears to include, by way of an appendix, material that was not part of the administrative record. We have confined our review to public comments by Avakian that were raised in the Kleins' motion to disqualify and that were before the ALJ and BOLI in the proceedings below.

The ALJ's order states, "The Formal Charges seek damages for emotional, mental and physical suffering in the amount of 'at least $75,000' for each Complainant. In addition to any emotional suffering experienced by Complainants as a direct result of Sweetcakes' refusal to bake them a cake ('cake refusal'), the Agency also seeks damages for suffering caused to Complainants by media publicity and social media responses to this case."
The final order likewise explains that the formal charges sought "at least $75,000" for each complainant and, "[i]n addition to any emotional suffering experienced by Complainants as a direct result of Sweetcakes' refusal to bake them a cake ('denial of service'), the Agency also seeks damages for suffering caused to Complainants by media publicity and social media responses to this case."

BOLI expressly declined to award damages based on the violation of ORS 659A.409, so our decision affects only the part of BOLI's order that grants injunctive relief.